**Andrew CLAY, Appellee,**

v.

**Coolidge CONLEE, Individually and in his official capacity as Sheriff of St. Francis County, Appellant.**

**St. Francis County Sheriff's Department**

No. 86–1620.

United States Court of Appeals, Eighth Circuit.

Submitted Nov. 14, 1986.

Decided April 1, 1987.

Rehearing Denied May 12, 1987.

---

Heaney, Circuit Judge, dissented and filed opinion.

Fletcher Long, Jr., Forrest City, Ark., for appellant.

Marva J. Davis, Little Rock, Ark., for appellee.

Before HEANEY, Circuit Judge, FLOYD R. GIBSON, Senior Circuit Judge, and BOWMAN, Circuit Judge.

BOWMAN, Circuit Judge.

The victim of a rape identified plaintiff Andrew Clay, a member of the Arkansas State Police, as her assailant. Within a few hours after Clay's arrest, the arresting officers discovered that the victim had identified the wrong man and that Clay was innocent. Clay promptly was released and the charge against him subsequently was dismissed. Clay later filed this action under 42 U.S.C. § 1983 against Coolidge Conlee, St. Francis County Sheriff, in both his individual and official capacity, alleging that the arresting officers lacked probable cause to arrest him and, therefore, violated his federal constitutional rights under the Fourth and Fourteenth Amendments. The jury returned a verdict in favor of defendant Conlee in his individual capacity, but found against him in his official capacity and awarded Clay $60,000 compensatory damages. The District Court denied Conlee's motion for judgment notwithstanding the verdict and entered judgment in accordance with the verdict, from which Conlee appeals. We hold that as a matter of law there was probable cause to arrest Clay. Thus, there being no violation of Clay's constitutional rights, we reverse the judgment of the District Court.

## I

In the early morning hours of December 2, 1983, a 28–year–old woman reported that she had been raped. The St. Francis County Sheriff's Department was notified, and defendant Conlee and one of his officers immediately went to the hospital where the victim had been taken for treatment. After receiving medical treatment, the victim recounted the circumstances surrounding the rape and identified her assailant as Andrew Clay.

The victim stated that earlier that evening she had gone to a party and to a local night club with her friends. As she and her friends were about to leave, the victim saw a man whom she thought she recognized as Andrew Clay in the driver's seat of a nearby car. Because her friends' car was crowded, she asked "Andrew" if he would give her a ride home, to which the man replied, "Okay." Since there was another man in the front passenger seat, the victim sat in the back seat. The male passenger was let out a short time later. The driver then drove to a secluded area on a gravel road, stopped the car, and raped the victim.

The victim walked to a friend's house and reported the rape. She told the officers that the assailant had struck her several times in the face and head with his hands. The victim's physical appearance and medical tests performed at the hospital where she was treated supported her allegations that she had been assaulted and raped. She identified her assailant as Andrew Clay. When questioned further about her identification of Clay as the assailant, the victim stated that she was "ab-

solutely positive" it was him. She told officers that she had gone to high school with Clay and had known him for fifteen years, and that he had shown her his Arkansas State Police identification card. The victim also provided the officers with the names of her friends who were present when she accepted the ride home from the man she thought was Clay.

Based on the clear evidence that the victim had been raped and on her positive identification of Andrew Clay, two officers from the St. Francis County Sheriff's Department applied for an arrest warrant the following morning. It is not clear from the record exactly what factual evidence was presented to the magistrate to establish probable cause, but an affidavit from the victim stating simply that Andrew Clay had raped her was submitted. The warrant was issued between 9:00 and 9:30 a.m. on December 2. Pursuant to Sheriff Conlee's instructions, the officers who were to execute the warrant first went to Arkansas State Police headquarters. As a professional courtesy, state police officials had been notified of the charge against Trooper Clay and accompanied the officers when Clay was arrested.

While the officers were en route to state police headquarters, Sheriff Conlee received a telephone call at 10:30 a.m. from a man who refused to identify himself. Though the trial testimony regarding the call was sketchy, it appears that the caller told Conlee that he "had the wrong man," and that an "Alfonso Powell" was the person actually involved in the rape. The caller provided no other information. Shortly thereafter, Conlee received a telephone call from the victim. She informed Conlee that she wanted to drop the charge against Clay because her mother thought that to press the charge would be too embarrassing for the victim and her family. Conlee advised the victim that he had no authority to dismiss a criminal charge. At no time during the conversation did the victim express any doubt about her identification of Clay. Following the conversation with the victim, Conlee unsuccessfully attempted to contact the arresting officers by radio. Apparently the officers were in state police head-quarters at the time. Conlee made no other attempts to contact the officers to inform them of the anonymous telephone tip implicating Powell in the rape.

The officers arrived at Clay's house between 1:00 and 1:30 p.m. After being invited inside, the officers advised Clay of the charge against him and of the fact that they had a warrant for his arrest. Clay inquired into the circumstances of the rape and the victim's name, and denied any involvement in the rape. After arriving at the county jail between 1:30 and 2:00 p.m., Clay asked the officers to interview the witnesses who were present when the victim accepted a ride home. The officers did so, and it was then that they learned that it was indeed Alfonso Powell, not Andrew Clay, who had agreed to drive the victim home. Clay was released later that evening between 9:30 and 10:00 p.m., and the rape charge was dismissed on December 5. Alfonso Powell later admitted his involvement. This civil rights action ensued.

## II

Conlee's primary contention on appeal is that as a matter of law there was probable cause to arrest Andrew Clay, and, consequently, that Clay was not deprived of his rights under the Fourth and Fourteenth Amendments. After reviewing the record, we agree with Conlee that as a matter of law there was probable cause to arrest Clay for rape.

There is no question here of Andrew Clay's innocence. That fact, however, is neither dispositive of nor relevant to the ultimate issue in the case—whether there was probable cause to arrest Clay for rape—since "[t]he Constitution does not guarantee that only the guilty will be arrested." *Baker v. McCollan*, 443 U.S. 137, 145, 99 S.Ct. 2689, 2695, 61 L.Ed.2d 433 (1979). *See Michigan v. DeFillippo*, 443 U.S. 31, 36, 99 S.Ct. 2627, 2631, 61 L.Ed.2d 343 (1979) ("The validity of the arrest does not depend on whether the suspect actually committed a crime; the mere fact that the subject is later acquitted of the offense for which he is arrested is irrelevant to the

validity of the arrest."). The Constitution prohibits only arrests that are not based on probable cause. That standard was defined by the Supreme Court in *Beck v. Ohio,* 379 U.S. 89, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964):

> Whether [an] arrest was constitutionally valid depends ... upon whether, at the moment the arrest was made, the officers had probable cause to make it— whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [person arrested] had committed ... an offense.

*Id.* at 91, 85 S.Ct. at 225; *see also Michigan v. DeFillippo,* 443 U.S. at 37, 99 S.Ct. at 2632. Thus, it is the "facts and circumstances within [the officers'] knowledge and of which they had reasonably trustworthy information" at the time of arrest to which we turn.

■ As noted above, the victim reported that she had been raped by Clay, with whom she had been acquainted for fifteen years. The medical evidence and the victim's appearance supported her allegation that she had been assaulted and raped. Clearly, law enforcement officers are entitled to rely on information supplied by the victim of a crime, absent some indication that the information is not reasonably trustworthy or reliable. *Easton v. City of Boulder,* 776 F.2d 1441, 1449 (10th Cir. 1985) ("[T]he skepticism and careful scrutiny usually found in cases involving informants, sometimes anonymous, from the criminal milieu, is appropriately relaxed if the informant is an identified victim...."), *cert. denied,* — U.S. —, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986); *Karr v. Smith,* 774 F.2d 1029, 1032 (10th Cir.1985) (police entitled to rely on information from property owner whose identification of arrestee as person who vandalized his property seemed reasonable); *Goodson v. City of Atlanta,* 763 F.2d 1381, 1386 (11th Cir.1985); *Gero v. Henault,* 740 F.2d 78, 84 (1st Cir.1984) (arrest precipitated by victim's assertion that she had just seen fugitive sought by police held supported by probable cause),

*cert. denied,* 469 U.S. 1191, 105 S.Ct. 965, 83 L.Ed.2d 970 (1985); *B.C.R. Transport Co. v. Fontaine,* 727 F.2d 7, 10 (1st Cir. 1984) (stating that "probable cause determinations predicated on information furnished by a victim are generally considered to be reliable"); *McKinney v. George,* 726 F.2d 1183, 1187 (7th Cir.1984); *Barnes v. Dorsey,* 480 F.2d 1057, 1061 (8th Cir.), *aff'g,* 354 F.Supp. 179, 183 (E.D.Mo.1973) (victim's report of crime gave arresting officers "ample probable cause").

■ Clay argues, however, that the facts and circumstances known to the officers when the victim gave her statement made her identification of him untrustworthy, and, thus, that before arresting him the officers should have investigated further by interviewing the witnesses who were present when the victim accepted a ride home. In support of his contention that the victim's identification was untrustworthy, Clay relies upon testimony indicating the officers were aware that the rape occurred on a dark road; that the victim had been drinking on the night of the rape; that the victim had glaucoma; and that the victim appeared "fuzzy-headed" when she first arrived at the hospital for treatment after the rape. Considering these facts (as well as other evidence adduced at trial) in the light most favorable to the plaintiff, we conclude, as a matter of law, that they do not vitiate the existence of probable cause. There is no evidence that the victim was incoherent, irrational, confused, or intoxicated when she made her statements to the officers. Nor was there anything unusual about her demeanor to suggest to them that her identification was not trustworthy. Moreover, the victim had provided a detailed (and accurate) account of her actions on the night of the rape and of the facts and circumstances surrounding the rape itself. Given all the circumstances that were known to the officers—including the victim's close proximity to the assailant during a rape that consumed ten minutes, her ride with him in the car, and the fact that the victim stated she had been acquainted with Clay for fifteen years and was "absolutely positive" he was the assailant—we

hold that it clearly was reasonable for the officers to consider the victim's identification of Clay trustworthy.

■ Clay also argues that, assuming there initially was probable cause to arrest him, it was vitiated when Conlee received the anonymous telephone tip implicating Alfonso Powell in the rape and the telephone call from the victim indicating that she wanted to dismiss the charge against Clay. It is undisputed that the officers who arrested Clay were unaware of these two telephone calls. Clay contends, however, that Conlee, having received this new information, failed to act reasonably to prevent the arrest. His theory essentially is that the two telephone calls cast doubt on the victim's previous identification and rendered it untrustworthy. We cannot agree. The first telephone call came from a man who refused to identify himself. The caller stated only that Clay was "the wrong man" and that Alfonso Powell was involved in the rape. Though we do not intend to suggest that anonymous telephone tips never should be considered and acted upon by law enforcement officers, there was no reason in the circumstances of the present case to delay Clay's arrest. The caller provided no information indicating the basis of his knowledge or otherwise tending to substantiate his allegation. Considering the victim's positive identification of Clay, the anonymous tip is hardly the type of "reasonably trustworthy" information that would vitiate the existence of probable cause.

Nor did the victim's telephone call to Conlee vitiate the existence of probable cause. The victim stated that she wanted to dismiss the charge only because her mother thought that to press charges would prove to be too embarrassing for the victim and her family. At no time did she express any doubt as to the accuracy of her previous identification of Clay as the assailant. The victim's telephone call thus is irrelevant to the issue of probable cause.

We hold that as a matter of law there was probable cause for Clay's arrest.[1] That being the case, his arrest did not deprive him of any federal constitutional right, and he thus has no cause of action against Conlee under § 1983. *Cf. City of Los Angeles v. Heller*, —— U.S. ——, 106 S.Ct. 1571, 1573, 89 L.Ed.2d 806 (1986).

### III

Conlee also contends that there was insufficient evidence to submit the case against him in his official capacity, and that, in that regard, instruction 13 (submitting plaintiff's theory of supervisory liability) was overly broad. Though our holding in Part II on the issue of probable cause is dispositive of the case, we think it would be helpful to comment upon an apparent misunderstanding by both parties on this issue. Our reading of the record and the briefs suggests to us that both parties seem to have equated supervisory liability with the liability of a public official in his official capacity. Such an equation, however, does not reflect an accurate view of the law.

■ Suits against officials in their individual capacity "seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 105 S.Ct. 3099, 3105, 87 L.Ed.2d 114 (1985). To establish personal liability in a § 1983 ac-

---

1. Our holding is not affected by the fact that the victim's affidavit was conclusory and set forth no facts on which the issuing magistrate could determine the existence of probable cause. It is unclear from the record whether the officers submitted any other affidavits setting forth the underlying facts of the case. Even assuming they did not, the validity of the arrest turns on whether the officers had sufficient facts at the time of arrest to establish probable cause, not on whether the warrant by which they purported to act was improvidently issued because of a deficient affidavit. Thus, the arrest was valid if

there was probable cause to believe that Clay committed the rape, regardless of whether the officers acted pursuant to a defective warrant or no warrant at all. *See Wilson v. Attaway*, 757 F.2d 1227, 1239 (11th Cir.1985); *United States v. Rose*, 541 F.2d 750, 756 (8th Cir.1976), *cert. denied*, 430 U.S. 908, 97 S.Ct. 1178, 51 L.Ed.2d 584 (1977); *see also Patzner v. Burkett*, 779 F.2d 1363, 1369 (8th Cir.1985) (stating that "a valid and voluntary consent to enter may be followed by a warrantless home arrest") (citing *United States v. Briley*, 726 F.2d 1301, 1303 (8th Cir. 1984)).

tion, the plaintiff must show that the official, acting under color of state law, caused the deprivation of a federal right. *Id.* at 3106. Though personal participation is not required for liability to attach, *Wilson v. Attaway,* 757 F.2d 1227, 1241 (11th Cir. 1985), there is no concept of "supervisory strict liability" in § 1983 actions. *Harris v. Greer,* 750 F.2d 617, 618 (7th Cir.1984). Instead, for a supervisor to be held liable for the acts of a subordinate, something more must be shown than merely the existence of the supervisor-subordinate relationship. *See, e.g., Hahn v. McLey,* 737 F.2d 771, 773 (8th Cir.1984) (per curiam) ("[A] supervisor may be liable for the acts of a subordinate if injury is inflicted upon the plaintiff as a result of a breach of the supervisor's duty to train, supervise, or control the actions of subordinates."). We do not intend here to explore or define the contours of supervisory liability. Instead, we simply wish to make the point that, when supervisory liability is imposed, it is imposed against the supervisory official in his individual capacity for his own culpable action or inaction in the training, supervision, or control of his subordinates.[2]

A § 1983 action against a government official in his official capacity, in contrast, is tantamount to an action directly against the public entity of which the official is an agent. *See Monell v. Department of Social Services,* 436 U.S. 658, 690

n. 55, 98 S.Ct. 2018, 2035 n. 55, 56 L.Ed.2d 611 (1978); *Brandon v. Holt,* 469 U.S. 464, 471–72, 105 S.Ct. 873, 878, 83 L.Ed.2d 878 (1985); *Kentucky v. Graham,* 105 S.Ct. at 3105. "It is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham,* 105 S.Ct. at 3105. In an official-capacity suit, the plaintiff must prove more than that his constitutional rights were violated by the named individual defendant, for a governmental entity is liable under § 1983 only when the entity itself is a "moving force" behind the violation. That is, the entity's official "policy or custom" must have "caused" the constitutional violation; there must be an "affirmative link" or a "causal connection" between the policy and the particular constitutional violation alleged. *See City of Oklahoma City v. Tuttle,* 471 U.S. 808, 823–24, 105 S.Ct. 2427, 2436, 85 L.Ed.2d 791 (1985); *cf. Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

In the present case, both parties read instruction 13 as submitting a theory of supervisory liability against Conlee in his official capacity. Since that instruction did not require the jury to find a "policy or custom," as mandated under *Monell* and its progeny, it was insufficient for that reason alone to impose liability against Conlee in his official capacity.[3] *See Mar-*

---

2. If the supervisor was personally or directly involved in the constitutional violation, there is no need to resort to a supervisory liability theory to link the defendant to the constitutional violation. *See Rollins v. Farmer,* 731 F.2d 533, 535 (8th Cir.1984).

3. Nor is the instruction cited by Judge Heaney in Part III of his dissent, *post,* sufficient to hold Conlee liable on an official capacity theory. That instruction was given in the course of instructions regarding Conlee's liability in his *individual* capacity. The instruction appears to incorporate elements and language applicable to both individual capacity liability and official capacity liability, but does not accurately state the law applicable to either theory when considered separately.

In addition, it is unclear whether the plaintiff sought to hold Conlee liable in his official capacity under the "policy or custom" line of cases, *see, e.g., City of Oklahoma City v. Tuttle,* 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791

(1985), or under the "final or authorized decision maker" line of cases, *see, e.g., Pembaur v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). If the former, the plaintiff's evidence clearly was inadequate to establish the element of causation. *See Tuttle,* 471 U.S. 823–24, 105 S.Ct. 2436 ("[W]here the policy relied upon is not itself unconstitutional, considerably more proof than the single incident will be necessary in every case to establish both the requisite fault on the part of the municipality, and the causal connection between the 'policy' and the constitutional deprivation.") (footnotes omitted). If the latter, the plaintiff's evidence likewise was inadequate. Sheriff Conlee testified, as did his deputies, that he did not give the deputies any specific instructions in regard to the investigation or arrest of Clay. In fact, Conlee testified (without contradiction from any other witness) that he completely turned the investigation over to his deputies. This is a far cry from the factual situation in *Pembaur,* where the county prosecutor, directly in re-

*chant v. City of Little Rock,* 741 F.2d 201, 204 (8th Cir.1984) ("A § 1983 plaintiff must establish the existence of a city policy or custom ... in order to recover against city employees in their official capacities."). Future § 1983 litigants should be alert to the differences between official-capacity suits and individual-capacity suits.

The judgment of the District Court is reversed.

HEANEY, Circuit Judge, dissenting.

This Court grievously errs in overruling the district court. The district court correctly decided that there was more than sufficient evidence from which the jury could have found that the defendants did not have probable cause to arrest Clay. We have no business substituting our judgment for that of the district court and the jury.

## I. PROBABLE CAUSE.

I have no quarrel with the general proposition that law enforcement authorities have probable cause to arrest a suspect when a victim of a crime has given detailed information to the authorities which is internally consistent and which identifies that suspect. But this is not always the case. *See B.C.R. Transport Co., Inc. v. Fontaine,* 727 F.2d 7, 10 (1st Cir.1984). Victims' reports of crimes carry merely a presumption of reliability. Law enforcement authorities still "must remain alert to the existence of any circumstances which would make that presumption inoperative." LeFave, Search and Seizure, A Treatise on the Fourth Amendment § 3.4(a), at 719 (2d ed. 1987) (citing *United States v. Phillips,* 727 F.2d 392 (5th Cir.1984); *State v. Morris,* 444 So.2d 1200 (La.1984)). And the ultimate question is still for the jury. *Linn v. Garcia,* 531 F.2d 855, 858 (8th Cir.1976); *see also B.C.R. Transport,* 727 F.2d at 10.[1] Here, the jury could have reasonably concluded that Sheriff Conlee and the Sheriff's Department did not remain alert to circumstances that made the presumption inoperative.

The jury properly could have found that the anonymous tip, the victim's intoxicated state, the victim's poor eyesight, and the suspect's clean record were factors which should have prompted the Department to seek further corroboration before arresting Clay. The Sheriff's Department clearly had plenty of time to carry out a more thorough investigation. The Department could have compared the victim's description of the rapist's car with a description of Clay's car; obtained a better description of the attacker, especially how he was dressed; and, more importantly, questioned some of the witnesses at the night club who saw the victim leave in the rapist's car. Such information, which the Department did in fact readily obtain shortly after Clay's arrest, would have exculpated Clay.

If the Sheriff's Department had taken some of these precautions, Andrew Clay and his family could have avoided the shock of Clay's arrest in front of the children, the immediate confiscation of Clay's state trooper's uniform, and the embarrass-

---

sponse to a specific request for legal advice, improperly instructed the deputies to "go in and get" the witnesses sought. 106 S.Ct. at 1294–95.

1. In *B.C.R. Transport,* the First Circuit considered a section 1983 action alleging wrongful seizure of property in violation of the fourth amendment. In *B.C.R. Transport,* a man named Hubbard had been picked up by the police as he was walking down a rural road. Hubbard told the police that he had agreed to work for B.C.R. but that employees forcibly held Hubbard against his will and made him work without pay. Two B.C.R. employees were arrested and B.C.R. property was seized based on Hubbard's allegations.

The Court found that the record supported a jury's finding that the police acted without prob-

able cause. The Court pointed out that the record showed that Hubbard was a drifter and that he talked loudly and rather incoherently when discussing the alleged crime. The Court also noted that the suspects were not known to the police as persons of violent propensities. *Id.* at 10.

In the instant case, the victim's behavior and condition perhaps should not have caused the police initially to doubt her explanation to the extent that the police should have doubted Hubbard's information in *B.C.R. Transport.* I do, however, firmly believe the anonymous telephone call added the doubt necessary to make this case factually analogous to *B.C.R. Transport.*

ment of broadcasts over radio and television that Clay had been arrested on suspicion of rape. In addition, there is evidence that Ms. Clay also lost her job as a dispatcher at the Prairie County Jail because of the implication of Andrew Clay as a rapist. The loss of her job could perhaps have also been avoided.

I concede that it is a close question whether the police, as a matter of law, had probable cause to arrest Clay before the Sheriff received the two telephone calls regarding the rape. The anonymous telephone call informing Sheriff Conlee that Alfonso Powell, not Andrew Clay, had raped the victim, however, clearly changed the circumstances of this case and converted the issue of probable cause into a question for the jury. The majority considers the call not to be "reasonably trustworthy" because the caller did not substantiate his allegation or show a basis for his knowledge. I think the majority misinterprets the significance of the phone call.

Clearly, an anonymous call is not reliable in and of itself. Thus, in this case, if Clay had not been the initial suspect and the Sheriff's Department received the anonymous call implicating Powell, the Sheriff could not have used the call as a basis for establishing probable cause to arrest Powell. More information would have been needed. In the instant case, however, the information that Powell committed the rape does not necessarily have to outweigh the information that Clay committed the rape in order to negate the initial presence of probable cause. It merely has to negate the presumption. The jury could reasonably have believed that the presumption was negated by the anonymous tip, the victim's intoxicated state, and her poor eyesight.

**II. ARREST WARRANT.**

The arrest warrant was clearly invalid on its face. The victim's affidavit was conclusory and set forth no facts on which the issuing magistrate could determine the existence of probable cause. The only question is whether the magistrate had more information other than that contained in the victim's affidavit that might have justified the arrest. *See United States v. Fernandez-Guzman,* 577 F.2d 1093, 1098 (7th Cir.1978). Here, there is no evidence of other affidavits provided to the issuing magistrate to establish probable cause.

**III. LIABILITY IN OFFICIAL CAPACITY.**

The majority's distinction between official capacity liability and supervisory liability is well taken. To show official capacity liability, the plaintiff must prove that a policy or custom of the Sheriff's Department caused the violation in question. *See supra* p. 1170. The following portion of the instructions adequately poses the question of the existence of a policy or custom in the Sheriff's Department:

> You are instructed that Collidge [sic] Conlee as sheriff is not liable for the acts of his deputies or jailers in his employ unless it is shown that their actions were carried out at his direction or with his approval or that their actions constituted a course of conduct or a custom that had been approved by him as sheriff.

In addition to Department "custom," this instruction also mentions actions "carried out" at Conlee's "direction or with his approval." The inclusion of these elements, while not necessary to an official-capacity liability instruction, does not introduce error into the instruction.

In *Pembauer v. City of Cincinnati,* 475 U.S. 469, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986), the Supreme Court considered a case similar to the present one. In *Pembauer,* a grand jury indicted a physician for fraudulently accepting welfare payments. After two of the physician's employees were subpoenaed and failed to appear before the grand jury, a court issued an order commanding the sheriff to bring the employees before the court to testify and to answer for contempt. When the physician refused to allow the deputies into his clinic, a county prosecutor instructed the deputies "to go in and get" the witnesses. Upon receiving instructions from their supervisors to follow the prosecutor's advice, the deputies, along with city police officers,

entered the clinic by chopping down the door with an axe. The physician filed a section 1983 action against the city and county for violations of his fourth amendment rights. The Supreme Court found the county liable because the decision of the prosecutor caused the violation of the physician's fourth amendment rights.

The Court analyzed what constituted government "custom or policy." The Court observed that in order for governmental liability to exist for actions by non-policymakers, "the decision to adopt that particular course of action [must] properly [be] made by that government's authorized decisionmakers." Moreover, "where action is directed by those who establish governmental policy, the municipality is * * * responsible whether that action is to be taken only once or to be taken repeatedly." 475 U.S. at —— – ——, 106 S.Ct. at 1298–99, 89 L.Ed.2d at 463–64.

With these principles in mind, the instruction, which allowed the jury to find Conlee liable in his official capacity if he either directed the deputies to act as they did in arresting Clay or if he approved of their actions was proper. In either case, the Sheriff himself would be the one making the ultimate decision as to how the deputies were to proceed. Such a choice by an "authorized decisionmaker" would be sufficient to create a causal link between the Sheriff's Department's policy and the constitutional tort against Clay.

The only question which poses any difficulty is whether Conlee was in fact the local government's authorized decisionmaker with respect to arrest procedures. The record permits a finding that he was. Sheriff Conlee was asked whether he was the supervisor responsible for making sure "that arrests are made and everything is in compliance with the law." Conlee answered that he was "the administrator in the Sheriff and Collector's office." Conlee was also asked whether "you have a policy or a practice established in the Sheriff's Department relating to the investigation of crimes," whether the arresting officers performed "according to your established procedure," and whether meetings were held to discuss "policy and procedure." In responding to each question, the Sheriff indicated that he ultimately had control over the operation of the Department as it concerned arrest procedures. I therefore believe the jury verdict should not be overturned.