**Robin A. DUBNER, Plaintiff–Appellant,**

v.

**CITY AND COUNTY OF SAN FRANCISCO; Michael Hennessey, Sheriff; Fred Lau, Police Chief, San Francisco Police Department; Lt. Ehrlich, Badge # 1367, San Francisco Police Department; Department of Public Health; Jail Health Services; Narda Ziegler, Sgt. Defendants–Appellees.**

No. 99–17319.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 9, 2001

Filed Sept. 4, 2001

Walter K. Pyle, Berkeley, California, for the appellant.

Lisa B. Berkowitz and Louise H. Renne, City Attorney's Office, San Francisco, California, for the appellees.

Before: SCHROEDER, Chief Judge, D.W. NELSON, and RAWLINSON, Circuit Judges.

D.W. NELSON, Circuit Judge:

Robin Dubner ("Dubner") appeals the district court's decision for defendants after a bench trial in her 42 U.S.C. § 1983 claim for unlawful arrest against the City and County of San Francisco ("City"), police officers Narda Ziegler ("Ziegler") and John Ehrlich ("Ehrlich"), and Chief of Police Fred Lau ("Lau"). The trial judge dismissed Dubner's claim because she failed to prove Ziegler and Ehrlich were the officers who arrested her and, therefore, could not establish lack of probable cause for her arrest. Since Dubner could not prove the underlying constitutional violation, the trial judge concluded that the City could not be held liable under *Monell v. Dep't of Social Svcs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). We have jurisdiction under 28 U.S.C. § 1291, and we affirm in part, reverse in part, and remand for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On October 7, 1996, the American College of Surgeons ("ACS") held a conven-

tion at the Moscone Convention Center in San Francisco. The Moscone Center is owned by the City of San Francisco. During the convention, ACS leased the entire facility and controlled who was allowed into the building. That morning approximately twenty members of the animal rights group, In Defense of Animals, gathered outside the entrance to protest medical experimentation on animals. Dubner, an attorney and amateur photographer, went to the demonstration intending to take photographs, perhaps meet a potential client, and serve as a "legal observer," but not as a participant.

The Moscone Center consists of two buildings (Moscone North and Moscone South). The demonstrators focused their attention on the entrance to Moscone North where there is a half circle driveway for cars and buses to drop off and pick up conventioneers. Between this driveway and the street—inside the half circle created by the driveway—is a pedestrian island. During the course of the demonstration, protestors alternatively stood on this pedestrian island waving placards, distributing literature, and shouting at conventioneers, or stood in the driveway and in front of the entrance to the convention center thereby impeding the conventioneers from entering and exiting the building.

At approximately 12:30 p.m., Sgt. Ziegler received word that a demonstration was taking place and proceeded to the Moscone Center. Ziegler first spoke to Gayle Grimes, who she believed was the organizer of the protest, and explained that they could continue the demonstration so long as they did not block traffic or prevent conventioneers from entering and exiting the building. Soon thereafter, Grimes and the other protestors tried to enter Moscone North, but were stopped by convention center security guards who locked the doors. Ziegler witnessed the protestors' attempts to enter the building and called for back up. Approximately fifteen officers responded to her call, including Lieutenant Ehrlich and Captain Dennis Martel. After several minutes of chanting slogans outside the convention center doors, the demonstrators returned to the pedestrian island.

As the demonstration continued, several officers spoke to Felix Niespodziewanski, the Manager of the Convention and Meetings Division of ACS, who expressed concerned about the demonstrators blocking the driveway and entrance to the building. The circular driveway and sidewalk in front of the building are considered private property of the Moscone Center, whereas the pedestrian island is public property. There are no barriers or signs indicating that the driveway and sidewalk are private property. Moreover, as Ehrlich testified, it would be difficult for anyone to tell where the private property line starts unless that person had specialized knowledge.

The officers informed Niespodziewanski that the sidewalk and driveway were considered private property controlled by ACS and asked if he wanted the police to make arrests. Niespodziewanski said that the demonstration could continue, but that he wanted the demonstrators to stay on the pedestrian island. At that point, an officer showed Niespodziewanski a citizen's arrest form and told him that if he signed it, "those people" would be arrested. The form provided space where the name of the offender and the relevant offense could be written in, but these were blank when Niespodziewanski signed the form.[1] Sev-

---

1. The citizen's arrest form reads as follows:

I made a CITIZEN'S ARREST on the person of _____ for the violations(s) of

eral officers testified that it was common practice to have the complainant sign the form and then fill in the name of one of the arrestees later followed by "et al." Niespodziewanski told the officers that he wanted the demonstrators kept on the pedestrian island, and that he wanted any person standing on the sidewalk or the driveway who was not wearing a convention badge to be arrested, regardless of whether that person was a demonstrator, passer-by, or convention attendee not wearing a badge.

After the citizen's arrest form was signed, Captain Martel directed Ehrlich to give a dispersal order using a bull-horn. Ehrlich gave the dispersal order two or three times standing in different locations outside the Moscone Center. Ehrlich testified that the dispersal order was not the "textbook" version because the language in that order applies to dispersal orders given in public streets. He recalled using words to the effect of "I ask you to leave the area in front of the doors and go to the pedestrian island. You can no longer remain on private property. Go to the public sidewalk. If you do not leave the area you will be arrested." The dispersal order did not specifically mention the protestors because Ehrlich's goal was to get "all non-credentialed people" out of the area.

At that point, some of the protestors moved to the pedestrian island and others remained on the driveway and sidewalk. Several convention attendees also remained near the entrance. Martel directed Ehrlich and Captain Tachini to start arresting people, and then pointed out a few individuals to arrest first "because they were more animated." Martel as-

sumed it would be obvious to the officers who to arrest because they were dressed differently than the conventioneers or because they had signs and leaflets. Sixteen people were arrested, including Dubner.

Dubner was at the demonstration for approximately one hour. For most of that time she was positioned on the sidewalk near the entrance to Moscone North, taking photographs of the protestors, and speaking with both demonstrators and conventioneers. At one point, Dubner entered the doorway to the convention center to take photographs of the protestors through the glass doors and was mistakenly locked inside. After being let out of the building, Dubner moved 8–10 feet to the east of the line of glass doors, and approximately 8–10 feet out from the building where she remained standing on the sidewalk that runs along the curved driveway. There is no evidence in the record that she was carrying any signs or leaflets.

According to her testimony, prior to the arrest Dubner was talking to one of the convention attendees and did not hear any dispersal order or anyone ask her to move to the pedestrian island. A male police officer came up to her and told her she would have to leave. She replied, "Excuse me?" and the officer repeated his statement. Dubner asked "Does this gentleman have to leave, too?," referring to the convention attendee. At that point, the officer said, "Arrest her," and two other officers handcuffed Dubner and took her into custody. Dubner is unable to identify either the first male officer who said, "Arrest her," or the two officers who handcuffed her. The only information available as to the identity of these officers is her

_____ on _____ committed in my presence at _____ and I did thereupon request the San Francisco Police Department to assume custody of the above subject. I understand that I will be contacted

by the District Attorney of the City and County of San Francisco should I be required to sign a formal complaint charging the above named subject with the commission of the violation(s) hereon indicted.

arrest report which lists Ehrlich and Ziegler as the arresting officers. Dubner and the other fifteen people arrested were then transported to the county jail where they were booked and detained.[2]

Dubner filed suit in state court against Officers Ziegler and Ehrlich, Police Chief Lau, and the City and County of San Francisco asserting several state law claims, and a § 1983 claim for unlawful arrest. The case was removed to federal court where both parties agreed to a bench trial before Magistrate Judge Phyllis J. Hamilton. Before trial, defendants filed a number of motions in limine including a motion to dismiss Chief Lau, which the court granted based on the absence of respondeat superior liability.

At trial and in deposition testimony, Ziegler and Ehrlich did not remember whether they had arrested Dubner. Ziegler explained that her name was listed as the arresting officer for fourteen or fifteen of the sixteen people arrested because she was the first officer on the scene. She testified that she did not arrest all fourteen or fifteen people for whom she was listed as the arresting officer. At the close of plaintiff's evidence, the trial judge dismissed Dubner's punitive damages claim because there was "simply insufficient evidence to support an allegation as to punitive damages." After all the evidence, Judge Hamilton issued her findings of fact and conclusions of law. *See* 1999 WL 820199 (N.D.Cal.1999). She decided that Dubner's claim against Ziegler and Ehrlich had to be dismissed because Dubner could not identify the arresting officers and, therefore, could not prove the arrest was unlawful. Based on this conclusion, Judge

Hamilton also dismissed Dubner's *Monell* claim against the City and County of San Francisco because there was no underlying constitutional violation. Dubner then filed this timely appeal.

## II. *STANDARD OF REVIEW*

In reviewing a judgment following a bench trial, this court reviews the district court's findings of fact for clear error and its legal conclusions de novo. *Tonry v. Security Experts, Inc.,* 20 F.3d 967, 970 (9th Cir.1994). The same standard applies to the district court's dismissal of a claim under Rule 52(c). *Price v. United States Navy,* 39 F.3d 1011, 1021 (9th Cir.1994). We review probable cause determinations de novo. *Ornelas v. United States,* 517 U.S. 690, 696–98, 116 S.Ct. 1657, 134 L.Ed.2d 911 (1996).

## III. *DISCUSSION*

We agree with the trial judge that the citizen's arrest was invalid because the citizen who signed the form did not see Dubner, describe her alleged offense, or point her out to the police. We also agree that the inaccuracies in the arrest report seem calculated to hide the identity of the arresting officers. We agree with the magistrate judge that the arrest was invalid. We disagree, however, with the conclusion that Dubner failed to establish a prima facie case against the defendants.

### A. *Identity of the Arresting Officers*

A claim for unlawful arrest is cognizable under § 1983 as a violation of the Fourth Amendment, provided the arrest was without probable cause or other justification. *See Larson v. Neimi,* 9 F.3d

2. Dubner alleged in her complaint that her camera was forcibly removed while she was in the jail cell and that the guards seized her and brought her to the floor with one arm twisted behind her back in order to remove

the camera. Dubner also alleged that she was refused medical attention for her asthma. These claims were dismissed after the bench trial as well, but Dubner does not challenge those decisions on appeal.

1397, 1400 (9th Cir.1993). The trial judge stopped short of deciding whether there was probable cause because Dubner could not prove the identity of the arresting officers. The court found that "the City's practice of not identifying the actual arresting officers on the arrest report seems deliberately designed to frustrate the efforts of potential plaintiffs in false arrest cases to establish lack of probable cause," but dismissed the claim because "Ninth Circuit law nonetheless imposes on Dubner the burden of identifying the officers she contends violated her constitutional rights." 1999 WL 820199, *15. We disagree as a matter of law.

■■■ Although the plaintiff bears the burden of proof on the issue of unlawful arrest, she can make a prima facie case simply by showing that the arrest was conducted without a valid warrant. At that point, the burden shifts to the defendant to provide some evidence that the arresting officers had probable cause for a warrantless arrest. The plaintiff still has the ultimate burden of proof, but the burden of production falls on the defendant. *See Gilker v. Baker*, 576 F.2d 245, 246 (9th Cir.1978) ("Once a warrantless arrest is established, the burden of going forward with the evidence passes to the defendant."). *See also, Martin v. Duffie*, 463 F.2d 464, 467 (10th Cir.1972) (plaintiff who has been arrested without a warrant "need only present a prima facie case of illegal arrest in order to sustain his burden"); *Patzig v. O'Neil*, 577 F.2d 841, 849 n. 9 (3d Cir.1978); *Dellums v. Powell*, 566 F.2d 167, 175–76 (D.C.Cir.1977). If the defendant is unable or refuses to come forward with any evidence that the arresting officers had probable cause and the plaintiff's

own testimony does not establish it, the court should presume the arrest was unlawful.

This minimal burden shifting forces the police department, which is in the better position to gather information about the arrest, to come forward with some evidence of probable cause. Dubner did everything she possibly could to identify the arresting officers. She obtained a copy of the arrest report and, assuming the officers listed were in fact the arresting officers, named them in her suit. During discovery, she asked the City and County for "[e]ach and every document authored or maintained by you (including your agencies, departments and employees) relating to this case in any way, including but not limited to all correspondence, personal notes, notebooks, memoranda, diaries, calendars, and summaries of facts." The City responded by objecting to the request and stating that it "has already produced all non-privileged, responsive documents to plaintiff in its possession with its initial disclosures." At that point, Dubner could reasonably assume she had named the right officers or the City would come forward with the name of the officers who actually arrested her. By shifting the burden of production to the defendants, we prevent this exact scenario where police officers can hide behind a shield of anonymity and force plaintiffs to produce evidence that they cannot possibly acquire.[3]

■■■ Since Dubner was not arrested pursuant to a valid warrant or citizen's arrest form, defendants had the burden of producing some evidence that the arresting officers had probable cause. None of the officers testified to having seen Dubner during the demonstration, much less to

---

**3.** The irony of the situation does not escape this court. By not listing the names of the actual arresting officers on the report, the police department highlights the need for legal observers like Dubner to attend demonstrations and record the badge numbers of arresting officers.

having seen her break the law. Appellees' references to the collective knowledge of the officers are, therefore, misplaced. While it is true that probable cause can be established through the collective knowledge of the officers at the scene, *see United States v. Valencia*, 24 F.3d 1106, 1108 (9th Cir.1994), there is no indication that any of the police officers at the Moscone Center witnessed Dubner violate any laws or communicated any information regarding Dubner to the arresting officers. Based on the total lack of evidence as to who arrested Dubner or what they knew at the time, it follows that the defendants failed to satisfy their burden of production and that Dubner has made out a valid claim of unlawful arrest.

### B. *Probable Cause*

 Appellees contend that, even if Dubner's failure to identify the arresting officers does not bar her claim, we should affirm because there was probable cause to arrest her for violating California Penal Code § 602.1 and § 409. Because we can affirm the district court on any ground supported by the record, we consider this argument now rather than remanding. *See Weiser v. United States*, 959 F.2d 146, 147 (9th Cir.1992). Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime. *See United States v. Garza*, 980 F.2d 546, 550 (9th Cir.1992). This is an unusual case because we cannot determine what the arresting officers knew at the time. Therefore, we must piece together the totality of circumstances known to the officers at the scene based on their testimony, Dubner's own testimony, and the undisputed facts at trial.

The arrest report states that Dubner violated Cal.Penal Code § 602.1. Section 602.1 provides that

> [a]ny person who intentionally interferes with any lawful business or occupation carried on by the owner or agent of a business establishment open to the public, by obstructing or intimidating those attempting to carry on business, or their customers, and who refuses to leave the premises of the business establishment after being requested to leave by the owner or the owner's agent, or by a peace officer acting at the request of the owner or the owner's agent, is guilty of a misdemeanor, . . . .

Thus, a violation of § 602.1 has two elements: (1) intentional interference, and (2) refusal to leave. Dubner may have refused to leave the sidewalk in front of the Moscone Center. She denied hearing either dispersal order, but the district court found her testimony incredible. Based on our review of the record, we cannot say this finding was clearly erroneous. Nevertheless, there is no evidence that Dubner intentionally interfered with the business of the Convention Center. Instead, the record shows that Dubner was taking photographs of the protestors from a position 8–10 feet away from the doors and conversing with convention attendees and protestors.

We reject Appellees' argument that intent to interfere can be inferred from Dubner's refusal to leave. In support of their position, Appellees cite *In re Ball*, 23 Cal. App.3d 380, 387, 100 Cal.Rptr. 189 (1972) (upholding conviction for violating Cal.Penal Code § 602(j) where defendant set up an antipollution table in the Disneyland parking lot that prevented trams from loading and unloading passengers). In that case, intent to interfere could be inferred from the defendant's refusal to leave *and* his conduct in deliberately posi-

tioning the table so as to obstruct the tram. Dubner's conduct, in contrast, does not suggest a deliberate attempt to obstruct. If anything, Dubner's behavior indicates an intent to avoid interfering with the convention.

Dubner's undisputed testimony is that she was at the Moscone Center to observe the demonstration and take photographs of the protestors. There is no indication that her conversations with attendees were intended to or had the effect of intimidating them. In fact, her behavior was indistinguishable from that of any member of the press, a curious passerby, or a legal observer. As the district court pointed out, there was no evidence that Dubner was "engaged in any traditional 'protest' activities, such as chanting, carrying a sign, handing out literature, or blocking the building entrances." Therefore, we conclude that, even if whoever arrested Dubner was privy to all of the information available to the officers at the scene and Dubner's testimony, there was insufficient evidence to warrant a prudent person to believe she had violated section 602.1.

 Appellees' other argument in support of probable cause is that by failing to heed the dispersal orders, Dubner violated Cal.Penal Code § 409 ("Riot, rout, or unlawful assembly; remaining present after warning to disperse").[4] Section 409 provides that

> [e]very person remaining present at the place of any riot, rout, or unlawful assembly, after the same has been lawfully warned to disperse, except public officers and persons assisting them in at-

tempting to disperse the same, is guilty of a misdemeanor.

No one claims the demonstration was a riot or rout, thus, Appellees' argument turns on whether it constituted an unlawful assembly.

 An unlawful assembly occurs "[w]henever two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner." Cal.Penal Code § 407. Appellees cite cases from the 1930s and late–1960s, applying § 409 in the context of violent demonstrations and labor disputes, in support of their position that this protest qualifies as an unlawful assembly. *See People v. Cipriani*, 18 Cal.App.3d 299, 95 Cal.Rptr. 722 (1971) (upholding conviction for failure to disperse from an antiwar demonstration, during a state of emergency, where rocks were thrown at National Guardsmen); *People v. Anderson*, 1 P.2d 64, 117 Cal.App.(Supp.) 763 (1931); *People v. Sklar*, 292 P. 1068, 111 Cal. App.(Supp.) 776 (1930). As the *Cipriani* court explained, "[t]he plain objective of section 409 is to enable law enforcement officers to de-fuse riotous situations by ordering persons to remove themselves from the area without any need to distinguish between the rioters and bystanders whose very presence aggravates the problem of restoring tranquility." 18 Cal. App.3d at 309, 95 Cal.Rptr. 722. California courts have since interpreted the statute to require a clear and present danger of imminent violence before bystanders can be arrested along with participants in an unlawful assembly. *See In re Brown*, 9 Cal.3d 612, 623, 108 Cal.Rptr. 465, 510 P.2d 1017 (Cal.1973) (narrowing scope of

---

4. Appellees do not specify which code section Dubner violated in failing to disperse. However, most of the cases cited in their brief involve § 409. Since this is the only code section that arguably covers bystanders to an unlawful assembly, *see People v. Anderson*, 1

P.2d 64, 117 Cal.App.(Supp.) 763, 769 (1931) (explaining difference between § 409 which covers bystanders and § 416 which only covers participants), it is Appellees' strongest source of probable cause.

section 409 to assemblies "which are violent or which pose a clear and present danger of imminent violence."); *In re Wagner,* 119 Cal.App.3d 90, 103, 173 Cal. Rptr. 766 (1981). *See also,* Witkin & Epstein, *California Criminal Law* §§ 888–93 (1988). Absent these compelling circumstances, we hold that the police are at least required to differentiate between the participants and innocent bystanders. We find that this protest did not involve a sufficient threat of violence to justify arresting nonparticipants under section 409.

Because the record does not support probable cause to believe Dubner had violated either code section, we reverse and remand for the trial court to determine whether Ziegler and Ehrlich can reasonably be held liable for the unlawful arrest.

## C. *The City's* Monell *Liability*

After finding that Dubner could not prove the identity of the arresting officers, the trial court dismissed her *Monell* claim against the City and County of San Francisco because there was no underlying constitutional violation. While the court's decision was based on a correct interpretation of the prerequisites for municipal liability, *see City of Los Angeles v. Heller,* 475 U.S. 796, 799, 106 S.Ct. 1571, 89 L.Ed.2d 806 (1986), its conclusion must be reevaluated in light of our holding that there was no probable cause for the arrest. Dubner alleges that the City had a policy of using incomplete citizen's arrest forms to affect unlawful arrests. She introduced evidence at trial that it was common practice in the San Francisco Police Department to have complainants sign the forms and then fill in the names of arrestees and their offenses later. And there was testimony suggesting that officers were instructed to use citizen's arrest forms in this way. Therefore, we remand

for a determination on the City and County's liability.

## D. *Dismissal of Police Chief Lau*

■ Before trial, the magistrate judge granted Appellees' motion in limine seeking to dismiss Police Chief Lau based on the absence of respondeat superior liability. Appellees argue that we should apply the same abuse of discretion standard in reviewing this decision as we apply to all decisions on motions in limine. This was not a typical motion in limine about an evidentiary issue, *see Luce v. United States,* 469 U.S. 38, 40 n. 2, 105 S.Ct. 460, 83 L.Ed.2d 443 (1984), but rather a dispositive ruling akin to a dismissal under Fed. R.Civ.P. 12(b)(6). Therefore, we review the order dismissing Chief Lau, as we would any Rule 12(b)(6) dismissal, de novo. In either case, we conclude that predicating Chief Lau's potential liability solely on a respondeat superior theory was a mistake of law.

■ Chief Lau could be held liable in his individual capacity if he knowingly refused to terminate a series of acts by others, which he knew or reasonably should have known would cause others to inflict a constitutional injury. *See Watkins v. City of Oakland,* 145 F.3d 1087, 1093 (9th Cir.1998); *Larez v. City of Los Angeles,* 946 F.2d 630, 646 (9th Cir.1991) (upholding a similar jury instruction in a § 1983 suit against Chief of LAPD). In addition, he could be liable based on his "own culpable action or inaction in the training, supervision, or control of his subordinates," *Larez,* 946 F.2d at 646 (quoting *Clay v. Conlee,* 815 F.2d 1164, 1170 (8th Cir.1987)); or his "acquiesce[nce] in the constitutional deprivations of which [the] complaint is made," *id.* (quoting *Meade v. Grubbs,* 841 F.2d 1512, 1528 (10th Cir. 1988)). Testimony revealed that it was common practice in the San Francisco po-

lice department to use citizen's arrest forms without specifying who should be arrested and for what violation. Captain Martel testified that officers were trained to use the citizen's arrest forms in this way and that it was common knowledge that the forms were used in this way. Therefore, we reverse the magistrate judge's decision dismissing Chief Lau and remand for a determination on liability.

### E. Dismissal of Punitive Damages Claim

Dubner also challenges the trial judge's determination, at the close of her case, that there was insufficient evidence to support punitive damages against Ziegler and Ehrlich. Punitive damages are available against individual police officers in a § 1983 claim only where the officers' "conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others." *Smith v. Wade*, 461 U.S. 30, 56, 103 S.Ct. 1625, 75 L.Ed.2d 632 (1983). The trial judge rightly concluded that there was insufficient evidence to support an allegation as to punitive damages. While we shift the burden to the defense to show probable cause after a prima facie case of unlawful arrest, we have never applied this burden shifting scheme to the issue of punitive damages. The officers were not obligated to come forward with evidence showing that they did not have nefarious motives or act with reckless indifference.

### IV. CONCLUSION

Therefore, we reverse the trial court's decision dismissing Dubner's claims against Ziegler, Ehrlich, the City, and Chief Lau, and affirm its decision regarding punitive damages. We remand for further proceedings in accordance with this opinion.