**Dale J. GERO, Plaintiff, Appellant,**

v.

**Richard A. HENAULT, et al., Defendants, Appellees.**

**Dale J. GERO, et al., Plaintiffs, Appellees,**

v.

**Richard A. HENAULT, et al., Defendants, Appellees.**

**City of Pittsfield, Defendant, Appellant.**

**Nos. 83–1837, 83–1838.**

United States Court of Appeals, First Circuit.

Argued May 8, 1984.

Decided July 27, 1984.

Rehearing and Rehearing En Banc Denied Aug. 29, 1984.

Francis D. Dibble, Jr., Springfield, Mass., with whom Bulkley, Richardson & Gelinas, Springfield, Mass., was on brief, for Dale J. Gero.

John F. Rogers, Pittsfield, Mass., with whom Leonard H. Cohen, and Cain, Hibbard, Myers & Cook, Pittsfield, Mass., were on brief, for appellee Anthony J. Pires.

Edward M. Reilly, Pittsfield, Mass., for City of Pittsfield.

Before CAMPBELL, Chief Judge, COFFIN and BOWNES, Circuit Judges.

BOWNES, Circuit Judge.

These appeals arise from a 42 U.S.C. § 1983 civil rights action and two pendent state law claims of assault and false imprisonment. Dale J. Gero and his wife, Donna, brought suit against Richard A. Henault and Edward Sherman, detectives in the police department of Pittsfield, Massachusetts, Anthony Pires, captain of detectives and acting chief of police at the time the alleged civil rights violation occurred, and the City of Pittsfield. After a jury trial, a verdict was returned for all defendants on the claims by Donna Gero. The jury found for the defendants Henault and Sherman in Dale J. Gero's action against them. It returned verdicts in favor of Gero in his actions against Pires and the City of Pittsfield. The district court set aside the verdict against Pires and entered judgment n.o.v. It denied Pittsfield's motions for judgment n.o.v. and for a new trial.

Gero appeals the judgment n.o.v. for Pires. The city appeals the court's refusal to grant its motions for judgment n.o.v. and for a new trial. Gero has not appealed the judgments on the verdicts in favor of Henault and Sherman. Donna Gero has not appealed.

We affirm the judgment n.o.v. for Pires, but for different reasons than those given by the district court, and reverse the judgment against the city.

The issue is whether the arrest of Dale J. Gero was the result of conduct illegal under the United States Constitution and/or state law arising from an approved policy and procedure followed by the Pittsfield Police Department or was simply a case of

mistaken identity. The specific constitutional violation alleged was the issuance by the city and the use by the police of an invalid arrest warrant.

## I. THE FACTS

Our review of the evidence is guided by two standards. On the judgment n.o.v. for Pires, the test is whether, as a matter of law, only one conclusion can be drawn. *Robinson v. Watts Detective Agency, Inc.,* 685 F.2d 729, 733 (1st Cir.1982), *cert. denied,* 459 U.S. 1204, 103 S.Ct. 728, 1191, 75 L.Ed.2d 436 (1983). *Rios v. Empresas Lineas Maritimas Argentinas,* 575 F.2d 986, 990 (1st Cir.1978). In the case against the city, we review the evidence and the infer-- ences that can be fairly drawn from it in the light most favorable to the plaintiff Gero, the prevailing party. *Robinson v. Watts, supra,* at 732; *DeVasto v. Faherty,* 658 F.2d 859, 861 (1st Cir.1981); *Engine Specialities v. Bombardier, Ltd.,* 605 F.2d 1, 9 (1st Cir.1979), *cert. denied,* 446 U.S. 983, 100 S.Ct. 2964, 64 L.Ed.2d 839 (1980).

We start with the testimony of Cynthia Phiffer. In early October 1979, Cynthia and her sister met a man called "J.D." at Danny's Bar in Pittsfield. After he had bought them a drink, Cynthia and her sister asked him to drive them home, which he did. On the drive home, J.D. said that his real name was Eric Walters, but that everybody called him J.D. He showed the women his forearms, one of which had scars across it. Walters told them that the scars were the result of a suicide attempt when he was in Walpole State Prison. He also said that he had guns and intended to rob a bank.

Walters and Phiffer met again by chance at Danny's Bar on October 15. This time the meeting was not friendly. Cynthia was playing pool; she looked across the room and thought that Walters was about to strike her sister, who was three or four months pregnant. Cynthia ran over to Walters and told him not to hit her sister, whereupon he promptly punched Cynthia in the jaw. Cynthia punched back, a fight ensued, and at one point Walters came after Cynthia with a knife. At the end of the fray, Cynthia had lost one tooth and two others were loosened. She went to the emergency room of the Pittsfield Hospital for medical treatment.

The next afternoon Cynthia went to the police station, gave a statement and signed an assault and battery complaint. She described her assailant as having the name J.D. (Eric) Walters, being six feet two inches in height, weighing two hundred pounds, having shoulder length blonde hair with a possible beard and mustache, and with scars on the left forearm. The statement describes Walters' vehicle as a 1967 yellow van with Arizona license plates. In her statement, Phiffer said that on the ride home with Walters the week before the assault, he showed two handguns to her and her sister, "a snubnose 38 and a Bulldog 38."

The police files contained a memo dated October 22 stating that Cynthia Phiffer called and identified the man who assaulted her as Eric Walters, supposedly living with a girl named Pat, a member of a motorcycle group called the Warlocks, on Brown Street in Pittsfield.

The next date of significance is November 1, 1979, when Walters attacked one David Sinopoli with a club on the street outside of Danny's Bar. Sinopoli sought refuge in a truck owned and driven by a friend, Gene Sayers. Another companion, William Decelles, was also in the truck. Walters smashed a window of the truck with the club before it got started. Walters then chased the truck in a blue van; there were two others with him. Several rifle shots were fired from the van through the cab windows of the truck. Sometime during the chase, the truck rammed the radiator grille of the van. Sinopoli, Sayers and Decelles eventually eluded Walters.

The police had been alerted to the incident shortly after the chase started and later that night located and impounded the van. It still had a piece of the truck bumper in its grille. After properly obtaining a warrant based on the statements of Sinopoli, Sayers and Decelles and other witnesses,

the police searched the van. They seized several bags of marijuana, a baseball bat with pieces of glass embedded in it, a number of rounds of rifle and handgun ammunition, including some .22 hollow point bullets, a prescription vial and a social security card bearing the name Lee Barrett, and several photographs. The van was registered to a woman in Phoenix, Arizona, and had Arizona license plates.

One of the photos taken from the van was inserted into an eight-photo lineup and shown to Sayers. He identified the photo as being that of the man who attacked Sinopoli with a club and drove the blue van. This photo was later determined to be of Eric Walters. The police made fifteen to twenty copies of Walters' photo and distributed them throughout the department.

On November 2, Officer Sporbert of the Pittsfield Police Department reported that he had previously stopped a yellow Ford van with Arizona license plates in the process of investigating an armed robbery of a store. The operator identified himself as Lee Barrett from Arizona. He claimed that he was living out of the van and had no local address. A computer check cleared both Barrett and the van. On November 3, Sporbert amended his report to state that the picture distributed was that of the person operating the yellow Ford van he had stopped.

On November 3, Detective Henault, who had been investigating the assault, chase and shooting involving Walters, went to the clerk-magistrate of the Pittsfield District Court and swore out three complaints for assault with intent to murder against "Lee Barrett a/k/a Erick Walters." Based on what he had been told by Henault, the clerk-magistrate determined that there was probable cause to issue an arrest warrant, and he did so, using the same names as on the complaints, "Lee Barrett a/k/a Erick Walters." No other descriptive information was stated on the face of the warrant. The arrest warrant was taken to the police station.

On November 13, Cynthia Phiffer ran into the police station and said that she just saw "J.D.—Eric Walters" driving a blue pickup truck. She was referred to Detectives Henault and Sherman who were working on the Walters case. Henault testified that when he heard Phiffer say that she saw "J.D. Walters," it suddenly "clicked" that the person who had assaulted her was the same one who had been involved in the chase and shooting on November 1. Phiffer agreed to come with Henault and Sherman to help find the blue pickup truck and Walters. On the way out of the police station, Henault picked up the arrest warrant. There was no photo attached to it, but both Henault and Sherman were familiar with Walters' photo. Phiffer pointed out the truck which she said Walters was driving. Because of Walters' history of violence, Sherman radioed for assistance and a cruiser manned by two uniformed policemen was dispatched. Phiffer told the detectives that she was afraid of Walters and she remained crouched behind the seat of the police car so the driver of the truck could not see her. Therefore, when the arrest was made she was not in a position to get a good look at the driver. When the blue truck stopped because of road construction, Detective Sherman, with Henault and a uniformed officer as backups, arrested the driver at pistol point. Both Sherman and Henault testified that the man arrested looked like the photo of Walters, with which they were familiar.

The person arrested was not Walters, but Dale J. Gero of Dalton, Massachusetts. After ordering Gero out of the truck and patting him down, the officers removed his wallet and examined its contents. The wallet contained an Arizona driver's license showing Gero as a resident of Phoenix. There was additional identification giving several Phoenix addresses. Other identification showed Gero's residence as Dalton, Massachusetts. There was also a student identification photo of Gero from Berkshire Community College in Massachusetts. Gero's wallet also contained bank charge cards, a Massachusetts fishing license in his name, and photos of his daughter and wife. All the identification in the wallet

was in the name of Dale J. Gero; there was nothing suggesting the names of Barrett or Walters.

Henault testified that the arrest warrant was shown to Gero at the time of his arrest. Gero denied that he saw it until sometime after he was booked at the police station.

As soon as the Phoenix connection was discovered by the arresting officers, handcuffs were put on Gero and he was put into the cruiser with the uniformed officers for transportation to the police station. It is clear that Detectives Henault and Sherman were confident that they had arrested the person responsible for the assault, chase and shooting on November 1. At the time of his arrest, Gero was wearing a long sleeve sweatshirt. No attempt was made then or subsequently to examine his forearms for scars.

Gero did, indeed, have a Phoenix connection; it led directly to its police department. He had been a Phoenix police officer from 1974 until he moved back to Massachusetts in the summer of 1979. He started as a uniformed officer on patrol car duty and then was put on plain clothes assignments involving surveillance and stakeouts of armed robbery suspects.

Gero did not tell the arresting officers of his Phoenix police career. On his way to the police station, he told the officers that they had "the wrong guy." When one of the officers asked Gero if he thought it was funny (the officer thought Gero was grinning), Gero replied, "You don't realize, some day you're going to find out."

Henault testified that, after Gero was advised of his rights, he asked him if he owned any handguns and Gero denied that he did. Gero testified that he was never asked this question.

After being booked, Gero called a lawyer, Gary Case, who came to the police station. Case first talked to Henault to find out the charges against Gero. He told Henault that he had represented Gero in the purchase of his home and that Gero had been a police officer. Henault allowed

Case to look at the Walters file. When Case told Gero of the charges, the photograph, and the identification by Phiffer as J.D. Walters, Gero asked to have the arresting officers interview him or the woman identify him. Case conveyed this message to Henault and Sherman, who told him that there were other cases they were working on and further information could be obtained later. Henault and Sherman then left.

In fact, Henault and Sherman were on their way to the home of Gero's in-laws in Dalton where Gero was living at the time. They were accompanied by an officer of the Dalton Police Department who knew Gero's father-in-law. Gero's wife stated that there were no rifles in the house, but she did produce a .22 Derringer pistol that belonged to Gero. The detectives thought this significant because of the .22 caliber ammunition seized from Walters' van after the chase and shooting. The police also took note that there was a Great Dane at the house; a Great Dane had been found in the basement of a building in which Walters had lived for a time.

Gero was held overnight in jail and released the next day on a $17,500 real estate surety bond posted by his wife's parents.

Henault continued the investigation. Another photo lineup was made with pictures of both Gero and Walters in it. Henault had the bartenders from Danny's Bar, Dan Reidy and his brother, examine the array. Both picked out Gero's photo as a picture of the person involved in the brawl with Cynthia Phiffer inside the bar and the assault outside it on November 1. A close friend of Walters, Jocko Sitzman, also identified Gero's photo as being that of Walters.

Henault then learned of a woman, Bonnie Brewer, who had lived with Walters for a time and knew him well. He located her and showed her the photo array; she was the first one to identify the real Eric Walters from his picture. Brewer agreed to come to the police station the next day and give a written statement. After Brewer failed to show up as agreed, Henault went

to her home. She said that she wasn't positive about the photo and wanted to see the person face-to-face before making a statement. This was arranged and on November 19 Brewer met Gero. She immediately said that he was not Walters, that she was sure about it, and he didn't have to show her his forearms. Brewer was, of course, aware of the scars on Walters forearms. Gero's forearms were exposed anyway, revealing a complete lack of scars. All charges against Gero were dropped. The real Walters was subsequently arrested in Phoenix, sent to Massachusetts, tried and convicted. He is now back in Walpole State Prison.

## II. THE LAW

The district court instructed the jury that the arrest warrant was unconstitutional because it did not sufficiently describe the person to be arrested. For the reasons that follow, we think this was error.

The seminal case on the constitutionality of arrest warrants is *West v. Cabell*, 153 U.S. 78, 14 S.Ct. 752, 38 L.Ed. 643 (1894). In that case, a warrant was issued for the arrest of James West and a man named Vandy M. West was arrested pursuant to it. Vandy West had never been known as or called James. Suit was brought by Vandy West against the arresting officer. The defense was that the warrant was issued and intended for Vandy West. The court instructed the jury that if they believed the person arrested was the one intended, the defendants were not liable. The Court reversed. It noted that under the common law, "affirmed into the American constitutions," *id.* at 86, 14 S.Ct. at 754, "a warrant for the arrest of a person charged with crime must truly name him, or describe him sufficiently to identify him." *Id.* at 85, 14 S.Ct. at 753. Here, the warrant gave the real name and an alias, albeit in reverse order, of the person the police intended to arrest. Unlike *West*, where the right person was arrested under the wrong warrant, the wrong person was arrested in this case.

In *Wong Sun v. United States*, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), the Court held that the particularity requirement of the fourth amendment "applies both to arrest and search warrants." *Id.* at 481 n. 9, 83 S.Ct. at 414 n. 9. The question is, how particular an arrest warrant must be.

Federal Rule of Criminal Procedure 4(c)(1) requires that an arrest warrant "shall contain the name of the defendant or, if his name is unknown, any name or description by which he can be identified with reasonable certainty." The Third Circuit has held that an arrest warrant for "John Doe a/k/a Ed" did not meet the fourth amendment particularity requirement even though the agent who executed the warrant knew that the defendant was the target of the warrant. *United States v. Doe*, 703 F.2d 745 (3d Cir.1983).

The Second Circuit has also held a "John Doe" warrant without a name or description invalid and beyond cure by extrinsic evidence. *United States v. Jarvis*, 560 F.2d 494, 497 (2d Cir.1977). In *United States v. Mahoney*, 712 F.2d 956, 961–62 (5th Cir.1983), the Fifth Circuit noted the opinions of the Third and Second Circuits but held that, even if a warrant for "JOHN DOE a/k/a DENNIS (LNU)" was invalid for lack of particularity, its "good faith exception" to the exclusionary rule applied.

The warrant here was not a "John Doe" warrant. It contained the actual name of the person sought and an alias that he used. We do not think it significant that the alias was the first name used on the warrant instead of following the a/k/a. Walters had used the name Barrett when stopped by the police officer investigating the store robbery and it checked out by computer. The warrant contained the two names used by the person sought.

This case is different than *Powe v. City of Chicago*, 664 F.2d 639 (7th Cir.1981), on which the plaintiff puts great store. *Powe* acknowledged the general rule that "[a]n arrest warrant that correctly names the person to be arrested generally satisfies the fourth amendment's particularity requirement, and no other description of the arrestee need be included in the warrant."

*Id.* at 645. *See also Wanger v. Bonner,* 621 F.2d 675, 682 (5th Cir.1980). In *Powe,* however, the court found that the authorities were not certain of the name of the arrestee. It held that where the authorities do not know or are uncertain of the name of the arrestee, then the name used in the warrant is arbitrary and the warrant must "give some other description of the intended arrestee that is sufficient to identify him." *Id.* at 647. We need not decide, however, whether we agree with the *Powe* holding because it is the general rule that applies here. The police here were certain that the arrestee was named either Lee Barrett or Eric Walters. The name Barrett had been verified by computer, and the name Walters had been obtained from several reliable sources. This is significantly different than *Powe* where the name in the warrant proved not to be the real name of the suspect, 664 F.2d at 642 n. 2; here, Walters was the real name of the person sought.

We cannot accept plaintiff's contention that the addition of Gero's name to the three complaints after his arrest by Chief Pires showed that the police were uncertain at the time the warrant issued of the name and identity of the person named in it. All it shows is that Pires thought that Walters had another alias. Based on what the police knew about Walters, this was not an unreasonable assumption.

The decisive question is whether, if Walters had been arrested, he could have challenged the warrant for lack of particularity. We think it clear that he could not. We find that the warrant met the fourth amendment requirement of particularity.

Moreover, even if the warrant were invalid, it was not the cause of Gero's arrest. The arrest was precipitated by Phiffer's assertion that she had just seen Walters driving a blue pickup truck. This was not a situation like that in *Powe v. Chicago,* 664 F.2d 639, where the plaintiff was stopped for a traffic violation and then arrested because of an outstanding warrant. The police, here, had probable cause to arrest Walters without a warrant. In-deed, in the light of what the police knew about Walters, they would have been derelict in their duties if they had not immediately pursued the vehicle which Walters was supposedly driving. And when the truck was stopped, Phiffer's identification was confirmed by the remarkable facial resemblance of Gero to the photo that the police had of Walters. That is one of the disadvantages, or perhaps advantages, depending on whose face is being identified, of wearing a full beard and mustache.

This clearly was a case of reasonable mistaken identity and the law does not afford the plaintiff any solace. In *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), McCollan was mistakenly arrested pursuant to a facially valid warrant. He brought a section 1983 claim for the intentional failure to investigate and determine that the wrong man was imprisoned. The Court stated:

> Respondent's innocence of the charge contained in the warrant, while relevant to a tort claim of false imprisonment in most, if not all jurisdictions, is largely irrelevant to his claim of deprivation of liberty without due process of law. The Constitution does not guarantee that only the guilty will be arrested.

*Id.* at 145, 99 S.Ct. at 2695 (footnote omitted). *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971) involved a mistaken arrest based on probable cause. The question was whether the evidence seized could be used against the real defendant. The Court's answer is pertinent to this case:

> Here there was probable cause to arrest Hill and the police arrested Miller in Hill's apartment, reasonably believing him to be Hill. In these circumstances the police were entitled to do what the law would have allowed them to do if Miller had in fact been Hill, that is, to search incident to arrest and to seize evidence of the crime the police had probable cause to believe Hill had committed.

*Id.* at 804, 91 S.Ct. at 1111.

*Baker* and *Hill* have been construed, and rightly so, to mean that where there is a

facially valid warrant or probable cause for arrest, and here there were both, the only question is whether it was reasonable for the arresting officers to believe that the person arrested was the one sought. *United States v. Glover,* 725 F.2d 120, 122 (D.C.Cir.1984); *United States v. McEachern,* 675 F.2d 618, 621 (4th Cir.1982). Indeed, this result seems compelled by the Supreme Court's language in *Hill* and the reference to the Supreme Court of California's opinion: "[W]e find no reason to disturb ... the conclusion that '[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest.' " *Hill v. California,* 401 U.S. at 802, 91 S.Ct. at 1110.

The facts here establish compelling reasons for the police reasonably to believe at the time they arrested Gero that he was Walters, the person named in the warrant.

We rule as a matter of law that Gero's mistaken arrest did not violate his constitutional rights.

As a matter of law, therefore, Chief Pires was not liable on the constitutional claim. Nor could he have been found liable on the state law claims of assault or false imprisonment. The evidence does not admit of a finding of assault against the chief and since there was both a valid warrant and probable cause for the arrest, there was no legal basis for a finding of false imprisonment under state law.

The plaintiff's request for instructions, the instructions given and plaintiff's objections thereto, his brief and oral argument make it clear that Gero was not making a claim for illegal police conduct and procedure following his arraignment. Nor do we see how, on the evidence, he could have any basis for such a claim.

Since the case went to the jury against the City of Pittsfield only on the 42 U.S.C. § 1983 claim without objection by plaintiff, the verdict against it must be reversed.[1]

There is one other matter that requires comment. In granting judgment n.o.v. for Chief Pires, the district court ruled as follows:

> However, mere negligence on Chief Pires' part will not support § 1983 liability. *Leite v. City of Providence,* 463 F.Supp. 585 (D.R.I.1978). Rather, the plaintiff must show that Chief Pires' failure to act reflected "a reckless or callous indifference" to the plaintiff's constitutional rights. *Clark v. Taylor,* 710 F.2d 4, 9 (1st Cir.1983). This court is of the opinion that no reasonable jury could have concluded, on the basis of Chief Pires' prearrest conduct, that Chief Pires' failure to prevent plaintiff's unconstitutional arrest reflected a callous indifference to plaintiff's constitutional rights. Therefore, a judgment n.o.v. for Chief Pires is appropriate.

*Clark v. Taylor,* 710 F.2d 4 (1st Cir.1983), was a suit against a prison warden, state police officers and the doctor director of the state crime laboratory. The portion of our opinion quoted was directed only to the warden's liability:

> We add the important emphasis that a prison official like defendant Mullen cannot be liable under section 1983 for merely negligent failure to act, *see Procunier v. Navarette,* 434 U.S. 555, 556, 98 S.Ct. 855, 862, 55 L.Ed.2d 24 (1978). He can, however, be liable for a failure to act that reflects a reckless or callous indifference to the rights and safety of the prisoners in his charge. *See Smith v. Wade,* 461 U.S. 30, 103 S.Ct. 1625, 1640, 75 L.Ed.2d 632 (1983).

*Id.* at 9. We do not think that the standard of liability of a prison official can be applied writ large to other state officials. We need not decide at this time under what circumstances Chief Pires might have been found liable, but note that he was a police policy maker, supervisor, and participant in the events leading to Gero's arrest. As the

---

**1.** We are not suggesting that a state claim for false imprisonment had been proven. Quite the contrary.

Supreme Court has noted, "the question whether an allegation of simple negligence is sufficient to state a cause of action under § 1983 is more elusive than it appears at first blush." *Baker v. McCollan,* 443 U.S. at 139, 99 S.Ct. at 2692.

*The judgment n.o.v. in favor of Chief Pires is affirmed; the judgment against the City of Pittsfield is reversed.* Costs awarded to Pires and the City of Pittsfield.