**Jason JORDAN, Plaintiff,**

v.

**Martin FOURNIER, et al., Defendant**

**No. CIV.03–178–P–S.**

United States District Court,
D. Maine.

July 2, 2004.

---

Kelly A. McMorran, Thomas P. Peters II & Associates, P.A., Lewiston, ME, for Jason Jordan, Plaintiff.

Michael J. Schmidt, Wheeler & Arey, P.A., Waterville, ME, Edward R. Benjamin, Jr., Thompson & Bowie, Mark E. Dunlap, Norman, Hanson & Detroy, Port-

land, ME, William R. Fisher, Attorney General's Office, Augusta, ME, for Martin Fournier, James Lawlor, Roland Godbout, Ronald Gagnon, Richard Small, William Welch, Androscoggin, County of, City of Auburn, City of Lewiston, Maine Department of Public Safety, Maine Drug Enforcement Agency, Michael Cantara, Michael Kelly, Roy McKinney, Roger Stricker, Gerry Baril, Defendants.

## AMENDED ORDER AFFIRMING THE RECOMMENDED DECISION OF THE MAGISTRATE JUDGE

SINGAL, Chief Judge.

The United States Magistrate Judge filed with the Court on June 3, 2004 her Recommended Decision (Docket No. 66). The Plaintiff filed his objections to the Recommended Decision on June 21, 2004 (Docket No. 67) and Defendants filed their response to those objections on June 24, 2004 (Docket No. 68) and June 25, 2004 (Docket No. 69). Defendants City of Auburn, City of Lewiston, Small, Welch and Lawlor filed their response to the Recommended Decision on June 28, 2004 (Docket No. 70) and Defendants Androscoggin County, Fournier and Gagnon filed their response to objections to the Recommended Decision on June 30, 2004 (Docket No. 71).

I have reviewed and considered the Magistrate Judge's Recommended Decision, together with the entire record; I have made a *de novo* determination of all matters adjudicated by the Magistrate Judge's Recommended Decision; and I concur with the recommendations of the United States Magistrate Judge for the reasons set forth in her Recommended Decision, and determine that no further proceeding is necessary.

1. It is therefore *ORDERED* that the Recommended Decision of the Magistrate Judge is hereby *AFFIRMED*.

2. The four pending motions for summary judgment (Docket Nos. 23, 25, 27 and 29) are GRANTED for all Defendants as to all of Plaintiff's claims against them.

## Recommended Decision on Four Motions for Summary Judgment

KRAVCHUK, United States Magistrate Judge.

Jason Jordan is the plaintiff in this 42 U.S.C. § 1983 action seeking damages from multiple defendants because on August 9, 2002, Officers Roland Godbout, Martin Fournier, and James Lawlor arrived at his 15 Witherell Road, Wales, Maine, home in the middle of the day and arrested him. There is no dispute that the officers made this arrest in the mistaken belief that Jordan was William Conly, a man who recently resided at the same address and for whom the officers had a valid arrest warrant stemming from the Maine Drug Enforcement Agency's "Operation Crackdown." Jordan claims that this mistaken identity arrest violated his Fourth Amendment rights to be free from unreasonable seizure[1] and amounted to the intentional infliction of emotional distress under Maine law.

Four motions for summary judgment are now ready for decision. There is one by the "State defendants," a group that is made up of Gerry Baril, Roger Stricker, Roy McKinney, Michael Kelly, Michael Cantara, the Maine Drug Enforcement

---

1. Although Jordan mentions his analogous rights under the Maine Constitution in his complaint (Compl, ¶ 64), he has not made any effort to distinguish this claim from his federal constitutional claim. I follow suit.

Agency, and the Maine Department of Public Safety. (Docket No. 23.) There is one by the "City defendants," consisting of the Cities of Lewiston and Auburn, William Welch, Richard Small, and James Lawlor. (Docket No. 25.) There is one by the "County defendants," being Androscoggin County, Martin Fournier, and Ronald Gagnon. (Docket No. 27.) And, there is one by Roland Godbout. (Docket No. 29.)

All four motions argue, in addition to other issues of liability, that Jordan's Fourth Amendment rights simply were not violated by his mistaken identity arrest. With this I agree, despite Jordan's insistence that the three arresting officers did not make adequate efforts to ascertain his identity at the time of his arrest; the mistaken arrest, albeit negligent, did not offend the Fourth Amendment. As Jordan has not generated a genuine dispute of material fact to the contrary, I recommend that the Court **GRANT** summary judgment to all the defendants on Jordan's Fourth Amendment claims. With respect to the state law claims against the arresting officers for intentional infliction of emotional distress, I recommend that the Court also **GRANT** the defendants' motions as to those claims as well.

### Discussion

A moving defendant is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). A fact is material if it has the "potential to affect the outcome of the suit under applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 52 (1st Cir.2000). A genuine issue is one that "may reasonably be resolved in favor of either party." *Cadle Co. v. Hayes*, 116 F.3d 957, 960 (1st Cir.1997).

### Generic Summary of Facts Material to the Fourth Amendment Counts [2]

As part of the Maine Drug Enforcement Agency (MDEA) "Operation Crackdown," the Androscoggin County Grand Jury indicted William Conly on a charge of drug trafficking on August 6, 2002, and on that day a warrant of arrest was issued for Conly by the Androscoggin County Superior Court listing his last known address as 15 Witherell Road, Wales, Maine, where Conly had lived until approximately two months prior to the time of the arrest.

On August 9, 2002, Roland Godbout was a police officer employed by the City of Lewiston, on assignment as an agent of the MDEA as of July 1, 2002. Prior to the arrest Godbout did not personally know William Conly or Jason Jordan but Godbout did obtain a photograph of William Conly from the Lewiston police file.

When a number of persons are to be arrested simultaneously, or at least as

---

**2.** There are four different sets of material facts—all with slight variations, different party perspectives, and elaborations depending on each set of defendants' particular potential liabilities. I have sifted through all four sets of material facts, Jordan's responsive admissions, denials, and qualifications, Jordan's statements of additional material facts, and the defendants' responses thereto. Rather than set these facts out separately, I have separately attached each statement of fact, replete with disputes and qualifications. Because this dispute boils down to the issue of whether the three arresting officers violated Jordan's Fourth Amendment rights when executing the arrest warrant of William Conly, I provide the following summary of the relevant facts leading up to and during his arrest. Any variations of these facts vis-à-vis a particular set of defendants is addressed below in the context of the legal analysis.

close in time as manpower and logistics permit, it is necessary for law enforcement agencies to pool their manpower in order to staff the various teams which will be sent to make the physical arrests. The goal of this approach is to avoid having persons the police are seeking to arrest being warned of that fact by receiving information about the arrests of others. In accordance with this goal, on August 9, 2002, Godbout, along with Deputy Fournier, who worked for the Androscoggin County Sheriff's Department, and Detective Lawlor, who worked for the City of Auburn Police Department, went to 15 Witherell Road around noontime to arrest William Conly. Lawlor's understanding was that a number of arrest warrants had been issued by the Androscoggin County Grand Jury, and the MDEA wanted to serve those warrants, and take those indicted persons into custody, in as short a time period as was possible.

As the officers got out of the van, Godbout went around to the back of the house to be sure no one escaped from the back door. The other two officers approached the front door. At that moment, Jordan was resting in bed at his home having left work early that day due to illness. He was just drifting off into sleep when he was awakened by the sound of his dogs barking. He heard "beating" on his front door while he simultaneously observed a "silhouette" on his back porch, this being Godbout. Upon exiting his bedroom, clad only in his underwear, Jason observed a uniformed police officer at his door. The officer, Fournier, began yelling or screaming through the door for Jason to put his

dogs away. Jordan complied with this demand.

He then went to the door and opened it and encountered Fournier and Lawlor. One or both of the officers asked Jordan to step outside.[3] Jordan asked if he could go in and get some pants on, to which an officer said, "No, this will only take a minute." The officers did not ask Jordan to identify himself. Jordan stepped out onto his front deck, at which time he was immediately grabbed, spun around, and handcuffed. When Jordan inquired as to the reason he was being arrested, he was told that grand jury indictments had been issued and that there was a warrant for his arrest for "trafficking." The whole episode happened fairly quickly with Jordan being given very little opportunity to say anything. Having learned a long time ago that you just do not argue with law enforcement officers, Jordan submitted to the arrest. Throughout this process Jordan remained clad only in his underwear. After several requests, Jordan was allowed to put on pants and shoes with the assistance of the officers, but he remained shirtless throughout his ordeal, his shirt having been thrown over his handcuffs.

During the entire time the officers were at his residence placing him under arrest, not one of them asked Jordan his name. Jordan states that he and his fiancée, who was also present, had repeatedly asked the officers what was going on, although Jordan at no time, in no way resisted the arrest.

Jordan was escorted by the officers, handcuffed, from his front steps to a waiting Androscoggin County prisoner trans-

3. In the County's statement of material fact it states that Fournier asked him if he was Bill Conly, and Jordan responded, "Huh? Yeah." (County SMF ¶ 5.) Fournier then stated: "Bill, can you come out for a second?" (*Id.* ¶ 6.) Jordan then stepped outside and asked, "What's up?" (*Id.* ¶ 7.) Jordan contends he did not hear these references to Bill. (Pl.'s Resp. SMF ¶¶ 6.) The City's material facts also reflects this exchange. (City SMF ¶¶ 54, 55.) I address this dispute below.

port vehicle parked at the end of his driveway. At the time of Jordan's arrest on his front porch, Godbout was not present but was around the back of Jordan's house. He rejoined the officers and Jordan on the way down the driveway. Fournier, it is undisputed, told Godbout that it was Bill Conly who had been arrested. Jordan was placed in the rear of the vehicle, while the three officers rode in the van's front area. The van made a stop at the Lewiston Armory to let out Godbout, and then proceeded to the Androscoggin County Jail.

Jordan was taken from the prisoner van to the jail booking area by Fournier and Lawlor. During the booking process at the jail, Jordan was asked various questions, including "what's your nickname" and do "they just call you Bill?" The two officers appeared surprised and stunned when he responded that his name was Jason Jordan. After this revelation, Lawlor and Fournier shared "a moment of silence" as they looked at each other.

Jordan was not immediately taken out of the handcuffs. The officers first undertook to confirm Jordan's claim. The handcuffs were left on for an additional fifteen minutes after Jordan identified himself and he remained at the jail for approximately ten more minutes after the officers removed the handcuffs during which period Jordan was allowed to telephone his fiancée. At no time did any of the defendants apologize to Jordan. In fact, according to Jordan, the officers made light of the situation.

Fournier drove Jordan from the jail back to the Lewiston Armory where they were rejoined by Godbout. On this trip, Jordan rode in the front seat of the van without handcuffs. While at the armory, Jordan was asked to complete a statement detailing these events, which he did, writing against a hood of a car. According to Jordan, he was specifically asked to state that he had not heard the officers ask his name during the arrest at his house but Jordan refused to include this information.[4] At some point during the process, Jordan was shown a photograph purporting to be that of William Conly, the person named in the warrant and the officers took a photograph of Jordan. (These two photos are part of the summary judgment record.)

Godbout then drove with Jordan back to Jordan's house, a trip which took fifteen minutes from the Lewiston Armory, Jordan riding this time in the rear of the van while Fournier and Godbout occupied the front. Once back at his house, Jordan produced identification and reportedly told the officers, "if you guys had asked me for one of these before we left, we never would have gotten this far." The officers left.

Jordan did not feel as though he were free to leave throughout this entire process. Jordan claims that the entire ordeal spanned two hours. Jordan did not suffer physical injuries of any kind in this exchange; no officer roughed him up or did anything unnecessarily physical toward him. Although Jordan is claiming an emotional distress type of damage, he has never sought any treatment, never has had any medication, nor has there been any kind of physical upset or physical manifestation of any type.

### Legal Standard

Fortunately there is settled case law to guide this Court in addressing Jordan's

---

4. There is some dispute about this, but it is essentially a credibility contest, which—for purposes of summary judgment—creates a dispute of fact, though one that does not turn out to be determinative given the other undisputed material facts. With respect to Jordan's efforts to make it clear that he filled out the statement on the hood of the car, it is not clear to me of what this is probative.

mistaken identity arrest. In *Hill v. California,* 401 U.S. 797, 91 S.Ct. 1106, 28 L.Ed.2d 484 (1971), the United States Supreme Court, addressing a challenge to a criminal conviction, visited the Fourth Amendment concerns surrounding an arrest of an individual, Miller, who the arresting officers mistook for an individual, the defendant Hill, a man they had probable cause to arrest. (Miller's arrest at Hill's residence led to an incriminating search of Hill's apartment.) In that case, the police did not have an arrest or a search warrant, but they had an address and a verified description of Hill. *Id.* at 799, 803, 91 S.Ct. 1106. Miller was two inches taller and ten pounds heavier than Hill. *Id.* at 803 n. 6, 91 S.Ct. 1106. At the time of his arrest Miller immediately indicated that he was Miller and not Hill. *Id.* at 799, 91 S.Ct. 1106.

The Supreme Court declined to disturb either the state court conclusion "that the arresting officers had a reasonable, good faith belief that the arrestee Miller was in fact Hill," *and* its determination that if " 'the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest.' " *Id.* at 802, 91 S.Ct. 1106 (quoting *People v. Hill,* 69 Cal.2d 550, 72 Cal.Rptr. 641, 446 P.2d 521, 523 (1968)). The Supreme Court summarized:

> The upshot was that the officers in good faith believed Miller was Hill and arrested him. They were quite wrong as it turned out, and subjective good-faith belief would not in itself justify either the arrest or the subsequent search. But sufficient probability, not certainty, is the touchstone of reasonableness under the Fourth Amendment and on the rec-

ord before us the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time.

*Id.* at 803–804, 91 S.Ct. 1106.

In a later case, *Baker v. McCollan,* 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979), the United States Supreme Court addressed this breed of Fourth Amendment claim in the context of a civil action. In *Baker,* the plaintiff's brother affixed his picture to a driver's license in the plaintiff's name and, after the brother ran afoul of the law, the plaintiff was arrested on a warrant and taken into custody despite the plaintiff's protests of mistaken identity. *Id.* at 140–41, 99 S.Ct. 2689. Rejecting the claim that the plaintiff's constitutional rights had been violated the Court reflected:

> Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law. Remedy for the latter type of injury must be sought in state court under traditional tort-law principles. Just as "[m]edical malpractice does not become a constitutional violation merely because the victim is a prisoner," *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), false imprisonment does not become a violation of the Fourteenth Amendment merely because the defendant is a state official. Having been deprived of no rights secured under the United States Constitution, respondent had no claim cognizable under § 1983.

*Id.* at 146–47, 99 S.Ct. 2689.[5]

Taking its lead from *Hill* and *Baker,* the First Circuit has also had occasion to ana-

---

**5.** The Court also discussed the more general parameters of due process rights upon arrest and detention:

> The Fourteenth Amendment does not protect against all deprivations of liberty. It protects only against deprivations of liberty

lyze such a mistaken identity arrest in the context of a 42 U.S.C. § 1983 civil rights Fourth Amendment claim. In *Gero v. Henault*, 740 F.2d 78 (1st Cir.1984) the Panel addressed the constitutionality of a mistaken identity arrest made pursuant to a valid arrest warrant. The police had information from Cynthia Phiffer, who had been assaulted by Eric Walters (a/k/a Lee Barrett) and who had signed an assault and battery complaint against him, that Walters was six feet two inches in height, weighing two hundred pounds, with shoulder length blonde hair with a possible beard and mustache, and with scars on the left forearm. *Id.* at 80.[6] Prior to the day of the arrest, Phiffer described Walters's vehicle as a 1967 yellow van with Arizona license plates. *Id.*

The actual arrest was triggered when Phiffer ran into the police station, indicating that she had just seen Walters driving a blue pick-up truck. *Id.* at 81. An officer pulled the warrant for Walters's arrest—which did not have his picture but the two officers involved in the arrest were familiar with photos of Walters—and proceeded with Phiffer to locate Walters. *Id.* The police stopped the blue truck when Phiffer pointed it out to them and arrested the driver, who, it turned out, was the plaintiff, Dale Gero. *Id.*

At the time of the arrest, the officers removed Gero's wallet finding an Arizona driver's license showing Gero as a resident of Phoenix, additional identification giving several Phoenix addresses and other identification showed Gero's residence as Dalton, Massachusetts, a student identification photo of Gero from Berkshire Community College in Massachusetts, bank charge cards, a Massachusetts fishing license in his name, and photos of his daughter and wife, and with nothing suggesting the names of Barrett or Walters. *Id.* at 81–82. (There was a dispute about whether the arrest warrant was shown to Gero at the time of the arrest. *Id.*) There was a "remarkable" facial resemblance between Gero and Walters. *Id.* at 84. Even though they were confronted with some warning signals about the subject's identity, the officers arrested Gero. *Id.* at 82. On the way to the station Gero told the officers they had the wrong guy. *Id.*

The First Circuit concluded that "*Baker* and *Hill* have been construed, and rightly so, to mean that where there is a facially valid warrant or probable cause for arrest, and here there were both, the only question is whether it was reasonable for the arresting officers to believe that the person arrested was the one sought." *Id.* at 84–85 (citing *United States v. Glover*, 725 F.2d 120, 122 (D.C.Cir.1984) and *United States v. McEachern*, 675 F.2d 618, 621 (4th Cir.1982)). "Indeed," the Panel explained:

accomplished "without due process of law." A reasonable division of functions between law enforcement officers, committing magistrates, and judicial officers—all of whom may be potential defendants in a § 1983 action—is entirely consistent with "due process of law." Given the requirements that arrest be made only on probable cause and that one detained be accorded a speedy trial, we do not think a sheriff executing an arrest warrant is required by the Constitution to investigate independently every claim of innocence, whether the claim is based on mistaken identity or a defense such as lack of requisite intent. Nor is the official charged with maintaining custody of the accused named in the warrant required by the Constitution to perform an error-free investigation of such a claim. The ultimate determination of such claims of innocence is placed in the hands of the judge and the jury.
*Id.* at 145–46, 99 S.Ct. 2689.

**6.** The run-in with Phiffer was not the only pre-arrest misconduct by Walters of which the police were aware. *Id.* at 80–81.

this result seems compelled by the Supreme Court's language in *Hill* and the reference to the Supreme Court of California's opinion: "[W]e find no reason to disturb ... the conclusion that '[w]hen the police have probable cause to arrest one party, and when they reasonably mistake a second party for the first party, then the arrest of the second party is a valid arrest.'" *Hill v. California*, 401 U.S. at 802, 91 S.Ct. 1106.

The facts here establish compelling reasons for the police reasonably to believe at the time they arrested Gero that he was Walters, the person named in the warrant. We rule as a matter of law that Gero's mistaken arrest did not violate his constitutional rights.

*Id.* at 85.

And, in *Dean v. City of Worcester*, 924 F.2d 364 (1st Cir.1991), the First Circuit concluded that there was no constitutional violation when the § 1983 plaintiff was forcefully arrested pursuant to a valid warrant when he was mistaken for a violent prison escapee. The arrest was undertaken on the basis of officers' drive-by impressions of resemblance between Dean and the escapee sought and the fact that Dean was seated on a rock at a city bus stop near the apartment where the escapee was staying. *Id.* at 366, 368. Dean was taken into custody even though he immediately told police his correct name and proclaimed his innocence, *id.* at 366, and despite the fact that, at six feet one inches, Dean was taller than the subject of the warrant, *id.* at 368 & n. 3.

### Arguments and Analysis

The points of contention between Jordan and the four sets of defendants break down into three principal areas. First, Jordan insists that there is no evidence that these defendants received proper training in avoiding mistaken identity arrests. Second, there is a dispute over whether were the officers acting reasonably with respect to considering the photograph and physical description of Conly when arresting Jordan. And third, there is a disagreement with respect to how the verbal communications and noncommunications between the arresting officers and Jordan figure into the reasonableness of the arrest.

### Training and Supervision

■ If there is no underlying constitutional violation by the three arresting officers, Jordan cannot hold the other defendants liable on theories of failure to supervise or policy and custom. *Gero*, 740 F.2d at 84 –85. However, evidence that the officers were or were not complying with the procedures or conforming their practice to their training could conceivably be probative of the reasonableness of a mistaken identity arrest. Be that as it may, Jordan's attempts to attack the defendants on this ground have no substance.

■ The City defendants have presented factual assertions supported by record citations that indicate that Lawlor, Fournier, and Godbout graduated from and received training at the Maine Criminal Justice Academy in proper arrest procedures, including warrantless arrests and arrests pursuant to court-issued arrest warrants and that they received in-house training and training with outside agencies such as the Maine Criminal Justice Academy.[7] The County defendants have provided evidence that Fournier has received training on proper arrest procedure and been certified as a reserved law enforcement officer after meeting the statutory law enforce-

7. (*See e.g.,* City SMF ¶¶ 1–29; County SMF ¶¶ 24.)

ment training requirements.[8]

Jordan responds to these assertions by stating that here is no evidence that Lawlor and Fournier received any training in ensuring the proper identification of arrestees and/or procedures for ensuring against wrongful arrests. Jordan faults the City, the County, and the State[9] for their silence as to the proper procedure to be followed in order to ensure the proper identification of suspects and to guard against unlawful arrests. For instance, in his memorandum responding to the State's motion, Jordan argues:

> They do not establish they were required to follow specific procedure, which would ensure a reasonable, logical

and well-trained approach to the execution of an arrest warrant. The Defendants' silence on this point leaves a proper question for the jury as to whether there was sufficient training and procedures and, if not, then should the superiors be responsible for such failed training. Plaintiff suggests that the Defendants are silent because proper training or any inducement to follow proper training, was lacking and that this failure encouraged, condoned and ultimately acquiesced in the subordinate's behavior that resulted in a violation of Plaintiff's constitutional rights. (Pl.'s Mem. Resp. State Mot. Summ. J. at 6.)[10] This line of attack is ineffectual with-

---

**8.** (*See* County SMF ¶¶ 24, 25.)

**9.** There are no facts material to training, policy, and procedure vis-à-vis the State, either in the State's statement of material facts or in Jordan's statement of additional material fact.

**10.** With respect to the City's motion, Jordan's argument goes like this:

> The defendants' reference to training that Auburn and Lewiston Police officers received through the Maine Criminal Justice Academy, their respective forces and outside training is not enough. While the affidavits specifically refer to training in the use of force and in carrying out arrest warrants, they all fail to establish that the officers receive any training in properly identifying arrestees and ensuring against unlawful arrests. Further, the exhibits attached by defendants regarding Standard Operating Procedures not only fail to establish that Auburn and Lewiston officers are properly trained in ensuring against unlawful arrests, but actually establish a clear genuine issue of material facts by showing that there has been no training and no efforts by either department to protect against wrongful arrests. The defendants' reliance on the Standard Operating Procedures is misplaced. Those exhibits actually assist Jordan in defeating the motions for summary judgment, in that they establish a clear genuine issue of material facts regarding whether Lawlor was properly trained and whether the respective po-

lice departments possessed adequate mechanisms to protect against wrongful arrests and misidentification in performing an arrest. Also, according to the defendants, the Standard Operating Procedures for both departments govern proper arrest procedures. The lack of any mention of taking reasonable precautions or any mention of ensuring proper identification of a suspect is *de facto* evidence of improper training in the area of wrongful arrests. The fact that the Standard Operating Procedures for both municipalities' police departments fail to even address the manner of ensuring proper identification when conducting an arrest based on a warrant, is evidence by itself that policymakers knew or should have known that the Standard Operating Procedures were inadequate and their continued adherence to those procedures would fail to prevent unconstitutional actions by its employees, amounting to deliberate indifference.

Essentially Jordan is arguing that the record's resounding silence on the issue of the Standard Operating Procedures' relationship to mistaken identity arrests standing by itself without any pattern of such conduct occurring repeatedly in either department gives rise to a permissible inference that Jordan's arrest occurred because policymakers were deliberately indifferent to training and protocol inadequacies. This argument ignores the fact that failing to train police officers not to arrest the wrong person is akin to failing to train them

out some evidence supporting Jordan's (currently unspecified) view of what a proper identification of arrestees/insurance against wrongful arrest training/policy would look like. As is, it is a conclusory assertion that there is something missing from the arrest procedures identified by the City, and, at this stage of the game, *Educadores Puertorriquenos en Accion v. Hernandez*, 367 F.3d 61 (1st Cir.2004) ("[S]ummary judgment remains a viable option in civil rights cases in which the plaintiff's aspirations exceed the proof that he or she can muster."), Jordan may not rely upon conclusory allegations, improbable inferences, or unsupported speculation to defeat summary judgment." *Hershey v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 317 F.3d 16, 19–20 (1st Cir.2003).

### Photograph and description comparison and communications, or lack thereof, between Jordan and the arresting officers

■ Apropos Godbout, Godbout (and the State) explains his lack of involvement in the actual arrest as necessitated by the need to cover the back of the house to assure that Conly did not evade the police by exiting that way. In Jordan's view, however, it was not reasonable for Godbout to elect to go to the back of the house during the arrest as he, as the officer most in the know, should have been the one, of all the officers, to go to the front to identify Jordan. In addition Jordan describes

as outrageous the fact that Godbout did not try to identify Jordan during the time he was proceeding with him to the transport van and on the way to the Armory.[11]

Vis-à-vis Fournier, the County takes the position that the information Fournier was proceeding on in making the arrest was the address and the name on the warrant, William or Bill Conly and a viewing of a copy of a photograph of William Conly. Fournier believed, based in part on viewing the copy of the photograph of Conly, that the individual who answered the door at 15 Witherell Road was William Conly. Jordan retorts: "That Fournier, himself, physically arrested Jordan, when he had a photograph as well as a valid description of the subject at his disposal, yet failed to properly identify him, is not only unreasonable, it is outrageous." The photograph purporting to be that of William Conly did not, to Jordan's eye, "look anything like" Jordan.[12]

With respect to Lawlor, the City contends that his role was to provide additional manpower to the MDEA in the event it was needed to apprehend and/or transport persons being arrested by the MDEA pursuant to warrants issued in connection with an MDEA drug trafficking investigation. The information about William Conly, and his residence in Wales, was supplied by Godbout. To this Jordan responds that Lawlor's passive reliance was not reasonable. He argues that Law-

---

not to commit perjury. *See Walker v. City of New York*, 974 F.2d 293, 299–300 (2nd Cir. 1992) ("Where the proper response ... is obvious to all without training or supervision, then the failure to train or supervise is generally not 'so likely' to produce a wrong decision as to support an inference of deliberate indifference by city policymakers to the need to train or supervise.")

11. Jordan claims that there is a material dispute of fact as to whether Godbout was present when Jordan was being clothed, but Jordan's own testimony does not suggest that he

was. (Jordan Dep. at 52.) Even if Godbout was present at this post-arrest juncture, I fail to see how this would tip the constitutional scales.

12. Jordan also notes that the report prepared by Fournier immediately following the incident does not state he saw a photograph of Conly. I hardly see this omission of acts taken in preparation for the arrest has the effect of creating a genuine dispute about whether Fournier viewed the photo.

lor could have viewed the photograph that Godbout had of Conly and points out that Lawlor admitted that Jordan looked a lot like another guy (one Corey Michaud), which should have triggered some further inquiry on Lawlor's part.[13] .

On the whole, Jordan faults all three officers for not attempting to compare the photograph of Conly with Jordan at the time of the arrest. In Jordan's view, the photograph purporting to be that of William Conly did not "look anything like" Jordan. Jordan also points out that Godbout's own report gives the description for Conly as follows: White male, 23 years of age, 5'10", 210 lbs., blond hair, blue eyes, while Jordan was described as a white male, 29 years old, 180 lbs., with brown hair and brown eyes.

Given these stark physical differences between the subject sought and Jordan, Jordan contends, it was completely unreasonable for the officers to believe they were arresting the correct individual and further inquiry as to the subject's identity should have been undertaken. For such a discrepancy to be considered reasonable, one would have to assume not only that these defendants, who had completed basic law enforcement training, could not tell the difference between a twenty-three and a twenty-nine year-old man, one of whom was three inches taller, the other thirty-pounds heavier, but that he also could not differentiate between blue or brown eyes, or brown and blond hair. This conduct cannot be deemed reasonable under any circumstances in Jordan's view.

With respect to the communications at the time of the arrest, the City and County contend that when Jordan opened the door Fournier asked: "Are you Bill?" Jordan said "yeah." Jordan has a different version of this interchange. He asserts that when he stepped out onto his front deck he

---

**13.** To give a flavor of Jordan's adamancy on Lawlor's proceeding on unverified assumptions, his memorandum states:

> Such an assumption does **shock the conscience.** Defendant's failure to make distinctions such as law enforcement officers are routinely called upon to discern is extremely unreasonable. Had Lawlor even looked at the photograph, which is not clear from the evidence, a law enforcement officer of his caliber and experience should have recognized the variations were substantial and sought clarification of Plaintiff's identity either by questioning himself right there, requesting positive identification from Plaintiff directly, or asking Defendant Godbout to see the photograph of Conly. Any of these actions would have been reasonable, yet Lawlor undertook none of them.
>
> . . . .
>
> . . . [I]n this instance the mistake in identity was unreasonable in the extreme. Lawlor stated that he did not know William Conly and that he wouldn't have recognized him. This by itself is unreasonable in that a photograph of the subject was readily available to him, but there is no evidence he ever

bothered to look at it. If he did not review the photograph and description of the individual to be arrested, that in and of itself was unreasonable. If Lawlor did review the description, failing to recognize he was arresting the wrong man was unreasonable given the stark physical differences between the subject sought and Jason Jordan, this then was even more unreasonable. Although Lawlor did not recognize the Plaintiff as Jason Jordan, he acknowledged that the Plaintiff resembled someone else. That realization alone should have been sufficient for him to confirm the identity of the arrestee at the time of the arrest. Lawlor is ostensibly a trained police officer, having been in law enforcement for over fifteen years and ascending to the level of Detective within the Auburn Police Department. In this instance, however, it appears that Defendant Lawlor utterly disregarded his own training, in his blind reliance on the MDEA, and failed to ensure that the subject's address was correct, and that the suspect arrested was in fact the subject sought. This unqualified reliance in and of itself was unreasonable.

(Pl.'s Mem. Resp. City Mot. Summ. J. at 7–9.)

was immediately grabbed, spun around, and handcuffed. Jordan also questions why, if Fournier did in fact ask if he was Bill at the door, he would then ask the identical question at the jail during booking? He also allows that if he did respond in this manner to the officers it was because he was dazed after being awoken.

Furthermore, Jordan argues, when he kept asking what was happening and no clear identification had been made, it should have become clear to Fournier that additional steps were necessary to ascertain Jordan's full name. It is also reasonable, Jordan asserts, to expect that the officers, including Fournier as the arresting officer, would have fully informed Jordan of the charges as well as the full name of the person they were there to arrest. Fournier's failure to take even one of these "fundamental steps" combined with his complicity in these events amounts, Jordan believes "to manifest unreasonableness and clear liability for the violation of Plaintiff's constitutional rights." (Pl.'s Mem. Resp. County Mot. Summ. J. at 7.)

The parties agree that when Jordan inquired as to the reason he was being arrested, he was told that "grand jury indictments" had been issued, and that there was a warrant for his arrest for "trafficking." The City points out that on hearing this Jordan did not tell the officers that they had the wrong person or protest his innocence in response to being told he was being arrested following his indictment for trafficking. Jordan "denies" this by stating that he and his fiancée repeatedly asked the officers for an explanation to no avail and Jordan elected not to argue with the law enforcement officers. Jordan describes the whole episode as happening fairly quickly, with Jordan being given very little opportunity to say anything. So, having "learned a long time ago that

you just don't argue with law enforcement officers," Jordan submitted to the arrest.

Looking at the totality of the circumstances of this arrest, *See Hill v. Scott*, 349 F.3d 1068, 1073 (8th Cir.2003), and taking these principles, as well as Jordan's other disputes into account, "on the record before [me] the officers' mistake was understandable and the arrest a reasonable response to the situation facing them at the time." *Hill v. California*, 401 U.S. at 803–04, 91 S.Ct. 1106. You have three officers who, Jordan agrees, thought—up until the questions during booking—that they had arrested Conly. All three officers were simply assuming they had the right individual on the basis of the facts that they were at the right address and the person who responded to them submitted to the arrest with no more than a request for explanation. Part of the totality of the circumstances of this arrest includes the interchange between Jordan and the officers that, by both sides' accounts, did not include loud protestations of innocence or mistaken identity. Jordan was at the right address and was of the right general age and body type.

With respect to the discrepancies between Jordan's appearance and the physical description of Conly, it is undisputed that none of the officers were personally familiar with either Conly or Jordan prior to the arrest. While to Jordan, who is obviously very familiar with his own appearance, the differences seem demonstrable, to a stranger comparing the two photographs, the images of Conly and Jordan are not so jaw-dropping different as Jordan believes. The First Circuit has reflected that:

> [W]e live in an age where altering physical features may be accomplished with facility, *see Blackwell v. Barton*, 34 F.3d 298, 304 (5th Cir.1994), where clerical errors in recording, receiving, or trans-

mitting data are commonplace, *see United States v. De Leon–Reyna*, 930 F.2d 396, 398–99 (5th Cir.1991) (en banc) (per curiam), and where descriptive inaccuracies can occur easily. Thus, courts have concluded with some regularity that relatively minor discrepancies in physical features or other data do not render unreasonable an arrest pursuant to a facially valid warrant. *See White v. Olig*, 56 F.3d 817, 820 (7th Cir.1995); *Rodriguez v. United States*, 54 F.3d 41, 46–47 (1st Cir.1995); *Blackwell*, 34 F.3d at 304; *Thompson v. Prince William County*, 753 F.2d 363, 364–65 (4th Cir. 1985); *Johnson v. Miller*, 680 F.2d 39, 41 (7th Cir.1982).

*Brady v. Dill*, 187 F.3d 104, 113 (1st Cir. 1999). The age difference, twenty-three verses twenty-nine, the height and weight, hair and eye color differences here, when placed in the context of the facts that the officers had the correct address and Jordan acquiesced to the arrest, distinguish this case from *Fulton v. Town of Rumford*, Civ. No. 95–173–P–H, 1996 WL 66232 (D.Me. Jan.24, 1996), wherein the officers arrested Robert Fulton Sr. who was forty-two years old, instead of Robert Fulton, Jr., the former's nineteen-year-old son and the arrest was made at a different address than indicated on the warrant. *See also Hill v. Scott*, 349 F.3d at 1072–73 (concluding that the mistaken identity arrest was constitutional even though there was a two-year age difference, a one-inch height difference, eye-color difference, and a twenty-five pound weight difference between the arrestee and the warrant subject). The possibility that the entire mistaken identity arrest could have been avoided on a close, on the spot, comparison of the photographs or by asking Jordan for identification, might have been laudable but it does not mean it is constitutionally required.

Just because Jordan and his fiancée asked for an explanation for the arrest, does not mean that officers should have suspected that Jordan was not the subject of their warrant or should have realized that further investigation was necessary. *See Hill v. Scott*, 349 F.3d at 1073–74 ("This is a case where further investigation would have cast doubt on whether Hill was the subject of the warrant. But that is always the case where an arrestee denies being the subject of a facially valid warrant; there can always be more investigation to verify identity. The question is, how much investigation does the Constitution require?"). It is not necessary to credit Fournier's and Lawlor's contention that Jordan affirmatively reacted to being called Bill at the time of the arrest to reach this conclusion. With respect to Jordan's claim that the officers should have asked him his name and/or requested identification, *Gero* and *Dean* make clear that, even if an arrestee protests his arrest and claims a different identity, officers are not required to credit these assertions and can proceed with the arrest.

Regarding Jordan's other points of contention, crediting the fact that Jordan was "in custody" for as much as two hours (whereas the City and the County claim somewhere in the vicinity of an hour and fifteen/ an hour and twenty-five minutes) this does not alter the complexion of the case, especially in view of the fact that the officers took immediate action to release Jordan once they learned Jordan's true name. *See Gero*, 740 F.2d at 82–83 (mistaken identity arrestee held overnight); *see also Brady*, 187 F.3d at 108–15 (discussing post-arrest due process rights).[14] Apropos the dispute over whether one of

14. Jordan persistently states that he was left in handcuffs for longer than the defendants suggest. However, even crediting his contention, my conclusion is the same.

the officers asked Jordan to indicate in his report that he did not hear the officers ask him his name, this, though unprofessional, would not be an independent constitutional violation, nor would this after-the-fact face-saving attempt alter my conclusion when thrown into the mix of other facts concerning the reasonableness of Jordan's arrest.[15]

At most, then, Jordan has generated a genuine dispute of fact that the officers were negligent when they arrested him on August 9, 2002. However, as the Supreme Court made clear in *Baker*: "Section 1983 imposes liability for violations of rights protected by the Constitution, not for violations of duties of care arising out of tort law." 443 U.S. at 146–47, 99 S.Ct. 2689.

### Intentional Infliction of Emotional Distress

■ For Jordan to succeed on his claims for intentional infliction of emotional distress against the arresting officers, he must show that these defendants: one, intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from their conduct; two, their conduct was "so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community"; three, their actions caused Jordan's emotional distress; and, four, the emotional distress suffered by Jordan was "so severe that no reasonable person could be expected to endure it." *Champagne v. Mid–Maine Med. Centr.*, 1998 ME 87, ¶ 15, 711 A.2d 842, 847 (internal quotation and citations omitted). There is simply no question in my mind that Jordan has utterly failed to create a genuine dispute of material fact to justify these claims going forward. I recommend that the Court grant judgment to the defendants on these state law counts as well.

### Conclusion

For the reasons given above I recommend that the Court GRANT the four pending motions for summary judgment (Docket Nos. 23, 25, 27, 29) as to all of Jordan's claims against all of the defendants.

### NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within ten (10) days of being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.

Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

---

15. Jordan also goes to pains to assert that he was never allowed to put his shirt on. I am not sure where he is headed with this fact, but it is evident that the officers would not have been expected to uncuff Conly to allow him to put his shirt on prior to taking him to the station and the officers were "entitled to do what the law would have allowed them to do" if Jordan had in fact been Conly. *Hill v. California*, 401 U.S. at 804, 91 S.Ct. 1106; accord *Dean*, 924 F.2d at 368.